UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

_____

Andrea Peterson, P.O. Box 582            DOCKET NO:  12-CV-6467 (GBD)(GWG)
New York, New York 10108

     Plaintiff

Vs.                                                             **PLAINTIFF MOTION FOR ORDER TO**
                                                                   **SHOW CAUSE PRELIMINARY INJUNCTION**
Apple Inc., 1981 Broadway, New York, NY
10023, Apple Inc., One Infinite Loop,
Cupertino, CA 95014

     Defendants

_____

Plaintiff moves by order to show cause for a preliminary injunction pursuant to Fed. R.

Civ. P. Rule 65, and pursuant to the ADEA 29 626 (b).  Plaintiff further requests that

pursuant to Rule 65 (3) that, "the hearing be set at the earliest possible time taking

precedence over all other matters except hearings on older matters of the same

character".

## PLEADING STANDARD

Pleadings in the case are being filed by Plaintiff In Propria Persona, wherein pleadings

are to be considered without regard to technalities.   Propria pleadings are not to be

held to the same high standards of perfection as practicing lawyers.   See Haines v.

Kerner 92 Sct 594, also See Power 914 F2d 1459 (11th Cir.1990) also See Hulsey v.

Ownes 63 F3d 354 (5th Cir 1995).   Also See In Re: Hall v. Belmon 935 F.2d 1106 (10th

Cir. 1991).

## STANDARD FOR PRELIMINARY INJUNCTION

The Court of Appeals for the Second Circuit has recently commented on the standards

for a **preliminary injunction** as follows:

The purpose of a **preliminary injunction** is to maintain the status quo pending a final determination on the merits. It provides relief which is 'interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.

Citing from Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir. 1979), "The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See* Caulfield v. Board of Education, 583 F.2d 605, 610 (2d Cir. 1978); See also New York v. Nuclear Regulatory Commission, 550 F.2d 745, 750, 755 (2d Cir. 1977); Triebwasser & Katz v. American Telephone & Telegraph *Co.* 535 F.2d 1356, 1358-59 (2d Cir. 1976). As to the kind of irreparable harm that the party seeking an injunction must show, the language of some past cases has suggested to some a spectrum ranging from possible to probable, which is defined as "not remote or speculative but . . . actual and imminent."

In the precedent setting Supreme Court case. Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937, 938, 39 [*1072] L. Ed. 2d 166 (1974), the court held that a mere loss of income or damaged reputation would fall short of the type of irreparable injury that is necessary for issuance of a temporary injunction as requested in this particular case. Further, Sampson holds that mere injury, however substantial in terms of money, time and energy necessarily expended in the absence of an injunction, is not enough. The Court said that the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the

claim of irreparable harm.   See also the courts analysis in Callicotte v. Carlucci, 698

F.Supp. 94.

An Eastern District of New York case stated that to obtain a preliminary injunction a

discharged employee must show that he or she (1) has very little chance of securing

further employment; (2) has no personal or family resources at [his or] her disposal; (3)

lacks private unemployment insurance; (4) is unable to obtain a privately financed loan;

(5) is ineligible for any type of public support or relief ... and (6) [is affected by] any other

compelling circumstances which weigh heavily in favor of granting interim equitable

relief. In essence the plaintiff must quite literally find [himself or] herself being forced into

the streets or facing the spectre of bankruptcy before a court can enter a finding of

irreparable harm. *Williams v. State University of New York,* 635 F.Supp. 1243, 1248

(E.D.N.Y. 1986).

Another line of cases in the Fifth Circuit, Hayes, Culpepper, and Murry, involve

employees who, having exhausted EEOC or other administrative remedies, have filed

Title VII actions in the district courts seeking final adjudication on the merits.  These

cases hold that where an employee with an action in this posture petitions the court for

a preliminary injunction, the element of irreparable injury will be presumed.  We find that

the Sampson, Parks, and Morgan decisions are inapplicable when, as here, the

employee has exhausted all administrative remedies and has filed suit in the district

court.

In *United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969),* this

court stated:  "Where ... the statutory rights of employees are involved and an

injunction is authorized by statute and the statutory conditions are satisfied ... the

usual prerequisite of irreparable injury need not be established and the agency to

whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction.... We take the position that in such a case, irreparable injury should be presumed from the very fact that the statute has been violated.  Whenever a qualified ... employee is discriminatorily denied a chance to fill a position for which he is qualified and has the seniority to obtain, he suffers irreparable injury and so does the labor force of the country as a whole."

## CASE BACKGROUND

1. In early January 2011 plaintiff was in Apple retail store located on Fifth Avenue at 59th Street.   Plaintiff was surprised when plaintiff saw a mature sales representative and commented to her plaintiff surprise that Apple hires mature Sales Associates/Specialists.

2. Plaintiff chatted with Toni for a while and told her about a letter plaintiff wrote to Steve Jobs years prior in which plaintiff stated that each day 7,912 Baby Boomers with a combined financial worth that exceeds trillions turn 60 and that Apple's marketing campaign's does not indicate a conscience strategy to target this market.  Based on plaintiff visits to Apple stores, Apple employees represent the demographic that Apple wants to attract, markets to.  Plaintiff letter, **EXHIBIT A** summarized that most boomers are PC users, and as many retire they would be in the market for a notebook as a desktop alternative due to among other things portability.

3. Toni introduced plaintiff to some of her colleagues who shared their diverse backgrounds, and that Apple does not look for individuals with technical background but are more interested in individuals with a diversity of experiences.

Toni shared how she collaborates and draws upon the strengths of her team members' background and knowledge in response to customer's questions and encouraged plaintiff to apply for a job.  Toni stated that employee referrals are given first consideration.   Toni and her colleagues appeared to be considerably lower than plaintiff age however plaintiff decided to apply.

4.  On February 17, 2011 plaintiff received an email from referrals@apple.com that stated, "Hi Andrea, Your friend Toni, thinks you'd be a good fit for Apple and has sent us your resume. Apple recruiters have access to your resume and if they find a good match between your experience and an open position, a recruiter will contact you directly. We'll keep your resume in our database for future consideration".

5.  In an email dated March 4, 2011 plaintiff responded to Apple.  "Thanks for your email alerting me that Toni referred me and thinks that I would be a good fit for Apple.  I do to.  I would like to be considered for the Expert and Specialist positions that are currently open at various locations in New York.  Please let me know when we may meet to explore the ways the diversity of my skills and experience would be an asset to Apple".

6.  On June 28, 2011 plaintiff received an email from Joe Ferry, the Recruitment Manager, New York City for Apple.   His email stated; "My name is Joe Ferry and I am a recruiter at Apple for our Manhattan Apple Retail Stores.  After reviewing your resume, I would like to invite you to attend our invitation-only recruiting seminar for the NYC Apple Stores as the first step in the interview process. Our team is currently seeking qualified Specialists and Inventory Specialists for our NYC Apple stores".

7. On June 30, 2011 the recruiting session was not a traditional recruitment interview.   In addition to Mr. Ferry, several Apple representatives attended. Approximately twenty people (approximate average age 30) who were in attendance were broken down in groups.  Each group was given a scenario of a hypothetical customer and asked to decide what products would be recommend, and what additional products would be proposed to the customer.  Each team made presentations to the overall group.

8. At the end of the session plaintiff met with Mr. Ferry and again stated plaintiff interest in working for Apple.  Plaintiff shared plaintiff surprise in seeing a mature Associate at the Apple store in January, and that plaintiff was encouraged to apply.  Plaintiff also told him about the letter plaintiff sent to Steve Jobs in which plaintiff discussed Apple's marketing focus, and that Apple's workforce represents the younger demographic that Apple markets to, and plaintiff suggestion that Apple recognize the potential market of millions of retiring Baby Boomers.

9. On July 6, 2011 Sarone Kruoch a Human Resource person from Apple's Upper West side called plaintiff and requested that plaintiff send him plaintiff resume. Mr. Kruoch scheduled plaintiff for an interview with Charles Kelly at Apple's Regional headquarters office, 401 W. 14th Street.

10. In July 2011 plaintiff was interviewed by Charles Kelly and another Apple manager.

11. On July 18, 2011 Sarone Kruoch called, and verbally offered plaintiff a Specialist position at Apple's Upper West side store at 1981 Broadway.   Mr. Kruoch asked

plaintiff to come in to complete New Hire paperwork.    He also told plaintiff that
plaintiff should bring a current Passport.

12. On July 19, 2011 plaintiff was given a written Offer Letter **EXHIBIT B**, and
completed New Hire paperwork.   One of the documents was an Intellectual
Property Agreement (IPA).  Where indicated on the form plaintiff inserted plaintiff
Copyright Registration Number and listed some examples of the Copyright
Application as; Curriculum Development, Performance Management, Training
and Development, Competency Development…

13. Plaintiff informed Mr. Kruoch and another HR representative, Bryant Martinez of
plaintiff concern with the language of the IPA, (**EXHIBIT C, 2 pages of the IPA**)
"if you do list such prior inventions, you hereby grant to Apple a royalty-free,
irrevocable, perpetual, worldwide license to any prior invention that is now or
hereafter infringed by an apple product, process, or method of doing business".
It sounded to plaintiff that plaintiff would be giving Apple a royalty-free,
irrevocable…use of plaintiff Copyright.  Mr. Kruoch and Mr. Martinez informed
plaintiff that they would obtain clarification on this statement.  Plaintiff completed
the new hire paperwork and signed the offer letter, contingent on agreement on
the IPA.

14. On the bus back to New Jersey plaintiff opened the documents plaintiff was
given.   The New Hire documents plaintiff signed were not included therefore
plaintiff called and spoke with Patricia Bailey.  Plaintiff told Ms. Bailey that plaintiff
would pick up the documents on Thursday (referencing July 21) when plaintiff
would be in New York again.

15. On July 20, 2011 to respond to plaintiff request for clarification of the IPA, Mr.

Martinez forwarded the attached email **EXHIBIT D**.   The email stated:

"Hi Andrea, Per our conversation, below is the response we received from Trey

Wichmann with our Compliance & Business Conduct team. If this appropriately

addresses your concerns please advise of your availability to quickly stop by

today to complete your new hire paperwork.

If you have any additional questions please feel free to contact us by 5p today.

Hi Dana,

If someone lists an invention as a "Prior Invention" on the IPA and does no

further work on it while they are an Apple employee, then it's theirs and theirs

alone, **except as stated in the IPA**:

If you do list such Prior Inventions, you hereby grant to Apple a royalty-

free, irrevocable, perpetual, worldwide license to any Prior Invention that is now

or hereafter infringed by an Apple product, process, or method of doing business

(hereinafter "Apple Product") if: (i) you were involved in the development or

implementation of that portion of the Apple Product which infringes your Prior

Invention, or (ii) you acquiesced or permitted other Apple employees to utilize

your Prior Invention in the course of their development or implementation of the

Apple Product, or (iii) upon first learning of Apple's use of your Prior Invention

you do not immediately notify in writing your Apple vice president of Apple's

infringing use of your Prior Invention and the need for a license thereto.

We can't advise people about the interpretation of this language, though -- the

agreement is what it is.  **If they have questions about it, they would need to**

**consult with their own counsel...".**

16. The IPA immediately prior to the signature line stated, "7.0 Voluntary Agreement. **You further acknowledge that you have had the opportunity to discuss this Agreement with your private legal counsel".**

17. Plaintiff does not have an attorney on retainer; therefore plaintiffs had to identify attorneys, forward the IPA to them, discuss plaintiff questions with them and obtain their advice.  Between July 20 to 26 2011 plaintiff sent emails and had conversations with several attorneys to obtain clarification on the IPA.   One attorney suggested that plaintiff consider a document to protect plaintiff, as Apple is a big Corporation with lots of legal resources.

18. On July 20, 2011 after the close of business plaintiff received an email from Ken Cooke, Apple Training and Development that welcomed new Apple store employees.   **EXHIBIT E.**

19. On July 21 plaintiff returned to Apple to pick up the documents and was given copies of a package of documents titled; new hire paperwork checklist.   Plaintiff again discussed the IPA and was told that all employees sign the IPA, before they start work.  Page two of the offer letter states "You must sign the Intellectual Property Agreement and return the signed agreement with this offer letter.   Any exceptions or approvals required under the terms of the Intellectual Property Agreement must be approved by your division's vice president and Apple's Legal Department prior to your beginning work".   Plaintiff explained that plaintiff would need to obtain advice from an attorney.  Mr. Kruoch told plaintiff that plaintiff would not be able to start on July 23, the date on the offer letter, and that the next time date plaintiff could start would be August 6, 2011.  Mr. Kruoch nor any other person offered or suggested that a request for an exception could be

requested from the division vice president so that plaintiff could begin training on July 23.

20. Plaintiff sent emails to several attorneys and explained that Apple's employment offer was contingent on plaintiff signing an IPA.   Following an exchange of emails, one of the attorney's pointed out the "if" in the IPA statement.   If, any one of the three events takes place, Apple would have rights to plaintiff work.   "If",

   a.  you were involved in the development or implementation of that portion of the Apple Product which infringes your Prior Invention.

   b.  you acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their development or implementation of the Apple Product.

   c.  upon first learning of Apple's use of your Prior Invention you do not immediately notify in writing your Apple vice president of Apple's infringing use of your Prior Invention and the need for a license thereto.

21. It is a challenge for a person plaintiff age to get a job particularly in the current economic environment therefore, because the scope of the work of the Specialist position that Apple offered plaintiff does not involve plaintiff copyrighted work plaintiff decided to sign the IPA.

22. On August 1, 2011 plaintiff stopped at Apple to sign the IPA.  Sal informed plaintiff that no one was in HR and that he could not accept a sealed envelope with the IPA.

23. On August 1, 2011 a couple hours after leaving the Apple store Dana Brooks called plaintiff.   Plaintiff later learned Ms. Brooks is the Assistant HR Lead.   Ms. Brooks told plaintiff that all positions were filled.   Plaintiff scheduled an August 3,

2011 meeting with Ms. Brooks to discuss what happened to the offer Apple made, and that plaintiff accepted contingent on IPA agreement.

24. On August 3 prior to the meeting plaintiff chatted with Mr. Kruoch. Plaintiff was surprised when neither Mr. Kruoch nor Mr. Martinez whom plaintiff had primarily interacted with were not in the meeting. As the forgoing indicates, most if not all of plaintiff communication had been with Mr. Kruoch and or Mr. Martinez. Mr. Kruoch could confirm that he told plaintiff that plaintiff could start on August 6. Patricia Bailey was in the room during the meeting, however did not participate. Also in the room was a man who sat at a computer with his back to plaintiff. Plaintiff had never seen him before. When plaintiff asked who he was, Ms. Brooks stated that he is a senior manager. He did not participate or make any comment during the meeting, nor was plaintiff introduced to him. As plaintiff was leaving plaintiff introduced herself and the man told plaintiff his name is Mario.

25. Ms. Brooks stated "most" positions were filled, a difference from her statement on the August 1st phone call that "all" positions were filled. Plaintiff stated "most" indicates positions are still open, and Ms. Brooks stated, there are qualified candidates in the pipeline and Apple has thousands of candidates. Ms. Brooks stated that plaintiff did not accept the position and that plaintiff offer had expired. Plaintiff told Ms. Brooks that since plaintiff could not sign the IPA until plaintiff obtained legal advice, Mr. Kruoch told plaintiff that plaintiff would not be able to start on July 23 and that plaintiff start date would be August 6. Dana stated that the August 6 date was a date plaintiff could start, not that it was offered as a start date. Plaintiff wrote in plaintiff notes, what is the difference.

26. Ms. Brooks also stated that Mr. Wichmann email provided the clarification on the IPA. Plaintiff went over to the computer Ms. Brooks was reading from and asked Ms. Brooks to scroll down to the section of Mr. Wichmann's email that states, "we can't advise people about the interpretation of this language, though -- the agreement is what it is. If they have questions about it, they would need to consult with their own counsel."

27. Ms. Brooks made issue with plaintiff return on July 21 to pick up copies of docs, to sign the IPA, and that plaintiff asked for forms plaintiff had signed contingent on...Plaintiff clarified and asked Ms. Bailey to confirm plaintiff conversation with her that plaintiff did not have the forms plaintiff signed and would return to pick them up, and that plaintiff return was not to sign the IPA.

28. Plaintiff questioned, why the offer letter dated July 19, 2011 was only valid until Friday July 22, 2011 while Apple continued to actively recruit to fill positions. Is it typical that all of Apple's offers are made and require acceptance within a three (3) day window? Both Mr. Kruoch and Mr. Martinez were fully aware that the delay was because plaintiff had to obtain legal advice on Apple's IPA. Plaintiff was not concerned because Mr. Kruoch informed plaintiff that since plaintiff could not sign the IPA plaintiff training start date would be August 6, 2011.

29. Plaintiff also questioned the reason plaintiff was "qualified" when the offer was made, and was not "qualified" for the open positions that Ms. Brooks stated Apple had qualified candidates in the pipe line to fill.

30. On August 10th plaintiff called Apple and left a message for Ms. Brooks. Mr. Kruoch asked the reason for plaintiff call. Plaintiff told Mr. Kruoch that plaintiff had just reviewed the package of new hire docs plaintiff was given and a

document was missing that plaintiff had signed, contingent on... Mr. Krouch immediately acknowledged and stated it was the offer letter and that he would get it from Mr. Martinez and send it to plaintiff.

31. On August 11th Mr. Kruoch called and told plaintiff that Ms. Brooks wanted plaintiff to send her an email requesting the offer letter plaintiff signed contingent on. Plaintiff asked Mr. Kruoch to send plaintiff an email making the request. When plaintiff did on receive the email plaintiff sent an email to Ms. Brooks. Several days later on August 15, 2011 plaintiff received an email, from Ms. Brooks. The email stated, "We discard all documents and do not retain paperwork onsite. When your offer expired on July 22, your documents were properly discarded. It is also my understanding that you previously requested all signed copies of all your documents on July 19 and you picked these documents up on July 20".

32. Because of Federal record retention laws, plaintiff thought Ms. Brooks meant that documents were not kept "onsite" so plaintiff responded. Plaintiff summarized from the August 3rd meeting discussion and plaintiff August 10th call with Mr. Kruoch. Ms. Brooks replied that when plaintiff offer expired, Apple discarded all documents with plaintiff signature and that the documents no longer exist. **EXHIBIT F** are the emails exchanged.

33. Plaintiff questioned when did Apple know that the document was "no longer available", "discarded". On plaintiff August 10, 2011 call Mr. Kruoch acknowledged it was the offer letter that was missing, and stated he would get it from Mr. Martinez and send it to plaintiff. On August 11, 2011 Mr. Kruoch called and stated that Ms. Brooks wanted plaintiff to send an email requesting the letter.

34. Did Apple make a job offer, or was it pretext to suggest that Apple does hire older individuals?   Plaintiff discussed plaintiff believe that Apple does not hire mature individuals with Toni and Apple Human Resource recruitment staff.   Plaintiff also discussed plaintiff letter to Steve Job that stated Apple's workforce represents the younger demographic that Apple markets to.

- Was it reasonable to expect that within three (3) days plaintiff could identify attorneys, provide the IPA to attorneys, obtain their advice and sign a five (5) page IPA agreement?

- Was it reasonable for plaintiff to believe as informed by Mr. Kruoch, that plaintiff would be able to start on August 6, 2011?

- Was it reasonable as Apple continued to recruit to fill open positions to expect that Apple would have called plaintiff to obtain the status, and or advise plaintiff that the offer would expire, or suggest that an exception would be requested?

35. Plaintiff was informed that Maggie Gregg is the HR Lead for the Region.   Plaintiff was unable to leave a message on Ms. Gregg's voice mail and did not receive a response to the email plaintiff sent therefore plaintiff went to Apple's Regional office on West 14th Street.   While plaintiff waited to see Ms. Gregg plaintiff could hear two women making calls to applicants and asking their interest in employment with Apple.   Plaintiff briefly told Ms. Gregg that plaintiff had not been able to reach her by phone and had not received a response to plaintiff email.   Ms. Gregg stated that her schedule was busy and that she would prefer a phone discussion rather than an in person meeting.

36. On the August 30, 2011 scheduled call Ms. Gregg informed plaintiff that she was aware of the events that occurred, and stated that plaintiff did not complete the paperwork and that plaintiff offer expired.   Ms. Gregg further stated that plaintiff was not an Apple employee, that the store had discretion to make a decision and that Apple did not have to maintain the documents, plaintiff paperwork was destroyed.

37. Plaintiff called Apple corporate office and spoke to the Assistant of the VP of Human Resources.   She informed plaintiff that someone would be in contact with plaintiff.

38. Tony Lagares a Senior Manager of Apple Retail Human Resources contacted plaintiff.  Plaintiff asserted that plaintiff signed the offer letter contingent on the IPA Agreement.   Plaintiff requested a position at another Apple store.  Because of the lower cost of living and that plaintiff had been unemployed for months, plaintiff requested to be considered for positions in the Metro Atlanta area.

39. For two (2) months from September 2, 2011 to November 11, 2011 plaintiff had voice, text and, email communications with Mr. Lagares without resolution.  Mr. Lagares often stated he was traveling; going in a meeting… plaintiff did not get the sense that resolution of plaintiff HR issue was a priority.   Apple did not offer plaintiff a position.

40. Plaintiff continued to update plaintiff profile on Apple's Job Opportunities website and applied for Specialist, Business Specialist and Business Leader positions at all retail stores within a reasonable commuting distance of New York City, and the Metro Atlanta area.   Apple website consistently lists current openings at multiple locations.  In addition, Apple staffed and opened two (2) new stores.

**EXHIBIT G** is the Wall Street Journal article on the December 2011 Grand Central store opening that stated that the store, one of Apple's largest at 23,000 square feet would employ 315 people.   In June 2012 Apple staffed and opened the Yonkers store that employs approximately 200 people.

41. Based on the foregoing plaintiff asserts that Apple filled a significant number of positions with individuals significantly younger than plaintiff to infer Age Discrimination, and did not again interview or offer plaintiff a Specialist position.

42. Apple discriminated against plaintiff due to plaintiff age.   Aside the expired offer, there were multiple opportunities for Apple to hire plaintiff.

## IRREPARABLE HARM

"The Supreme Court has said: "It seems clear that the temporary loss of income, ultimately to be recovered does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 [39 L. Ed. 2d 166, 94 S. Ct. 937] . . . (1974)

In Callicotte v. Carlucci, 698 F.Supp. 944 the court in citing Sampson v. Murray stated;

"The government, relying on *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed. 2d 166 (1974), urges the Court to adopt a higher standard for interim injunctive relief in federal personnel actions. The Supreme Court in *Sampson* required the plaintiff, a federal employee who alleged that the agency dismissed her without following the procedures under the Civil Service Act, to show irreparable injury of an "extraordinary degree" for injunctive relief, *id.* 415 U.S. at 92 n. 68, 94 S.Ct. at 953 n. 68. The Court predicated its imposition of a higher standard on the grounds that the government must be given wide latitude to handle its own internal personnel affairs. *Id.* at 83, 94 S.Ct. at 949. The Court, however, did not and has not expressly extended this rule to employees alleging violations of their statutory civil rights. Such challenges raise equally

compelling, if not stronger governmental interests, in the enforcement of our nation's **cases would undermine this vital interest in eradicating discrimination".**

**It would also undermine the Congressional Intent in the passing of the ADEA.**

When evaluating motions for injunctive relief in discrimination actions, several circuit courts have refused to adopt a higher standard and relied instead on the traditional one. See Holt v. Continental Group Inc., 708 F.2d 87, 91 (2d Cir.1983); E.E.O.C. v. Anchor Hocking Corp., 666 F.2d 1037 (6th Cir.1981); Porter v. Adams, 639 F.2d 273 (5th Cir.1981). This Circuit has not resolved whether or not a higher standard is required for plaintiffs challenging their dismissal on grounds of discrimination. See Wagner v. Taylor, 836 F.2d 566, 575 n. 66 (D.C.Cir.1987). While the Court is not persuaded that the higher standard should apply in actions brought under the civil rights laws, it need not resolve the issue for purposes of this litigation because the plaintiff has satisfied her burden under either standard.

In, Akili v. Sise, 38 FEP 553 (N.D.N.Y. 1984,in *a* **Title VII** *case.* The plaintiff sought a preliminary injunction to prevent his being discharged from his job as a typist, allegedly because of race discrimination. The court held that the **pending loss of his earnings and the possibility that he might be unable to secure another job** were clearly insufficient to show "irreparable harm."

In Holt v. Continental, 708 F.2d 87 a **Title VII** case, the court stated, "With respect to irreparable injury, an absolute requirement for a preliminary injunction, Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1359 (2d Cir.1976), we agree with Judge Zampano that the requisite irreparable harm is not established in employee discharge cases by financial distress or **inability to find other employment, unless truly extraordinary circumstances are shown**. Sampson v. Murray, 415 U.S.

61, 91-92 & n. 68, 94 S.Ct. 937, 953 & n. 68, 39 L.Ed.2d 166 (1974); EEOC v. City of Janesville, 630 F.2d 1254, 1259 (7th Cir.1980)".

Most ADEA cases are extraordinary.   It is stated and was acknowledged in the ADEA Congressional Statement of Findings and Purpose.   It is demonstrated in the challenges that individuals protected under the Act experience in finding employment in the current economic environment.   Today, the country is beginning to show signs of recovery from a recession and jobs and employment are the top issues cited by citizens in the current presidential campaign.   Due to high unemployment and the economic environment older workers have experienced the greatest impact as they are who are first laid off, and who must compete with younger workers who because of high unemployment apply and will accept even part time positions well below their skills, experience and qualifications.

The loss is not "temporary" as cited by the Supreme Court in Sampson.   Mature applicants never regain the lost compensation and in many, many cases prematurely began Social Security annuity to obtain a source of income.   Moreover it is a different economic environment than when the Supreme Court in Sampson ruled in 1974.   The high unemployment of the past 4 years is almost double what it was in 1974 therein loss of income, as in the case of plaintiff, has not been "temporary".

Citing from Monroe v. United Air Lines Inc. 736 F. 2d 394.   The ADEA was enacted in 1967 in response to growing concern over unemployment among older workers and Congress' belief that much of the problem was attributable to "arbitrary discrimination in employment because of age. "29 U.S.C. Sec. 621 (Congressional Statement of Findings and Purpose).   One step Congress took in dealing with age discrimination was

to make it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's age. "29 U.S.C. Sec. 623 (a)(1).

29 USC § 621 - CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE

**(a)** The Congress hereby finds and declares that—

**(1)** in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

**(2)** the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

**(3)** <u>**the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;**</u>

**(4)** the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

**(b)** It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

Further in support is the court's statement in Callicotte v. Carlucci.  Extending the higher standard to employment discrimination cases will undermine the vital interest in

eradicating discrimination and, will also undermine the Congressional Intent/Purpose in passing the ADEA.

Additional evidence is a recently published article in the <u>Wall Street Journal</u>, "Oldest Baby Boomers Face Jobs Bust," cited U.S. Department of Labor ("DOL") statistics that four million Americans aged 55 to 64 are unable to find work, a number that has doubled over the course of five years.  The article also cited DOL statistics showing that the average duration of unemployment for those aged 55 to 64 is 56.6 weeks, as compared to 35.9 weeks for 25- to 34-year-olds, and 47.8 weeks for 45- to 54-year-olds. For the reasons cited and discussed plaintiff further asserts that the standard for Preliminary injunction in ADEA cases should not be the same as in than other employment discrimination cases

In age discrimination cases, courts have awarded preliminary relief when the employee's entire future economic stability would be jeopardized by the employer's action. Thus, in Morrow v. Inmont Corp., 30 F.E.P.Cas. (BNA) 1019 (W.D.N.C. 1982), the court issued a preliminary injunction reinstating a saleswoman who was fired after filing charges of sex and age discrimination. The court justified its action on the basis that she would suffer irreparable loss of commissions and business contacts while waiting for her charges to be litigated. **The plaintiff had been unable to find other work. The court observed that she "is being punished daily for pursuing her rights, and there is substantial likelihood that she cannot be made whole . . .** if she is not provided interim relief." 30 F.E.P.Cas. (BNA) at 1026. See Monroe v. United Airlines, Inc., 34 F.E.P.Cas. (BNA) 1610 (N.D.Ill. 1983).

According to information prepared by Nancy Pelosi, former Speaker of the U.S. House of Representatives, job losses in the current recession have been much more severe

than previous recessions. Till vonWachter, an economics professor at Columbia University in a study on the long-term earnings of workers who lost their jobs[1] stated, "On average most workers do not recover their old annual earnings." The study further stated, **"Older workers' wages usually slide more than those of younger workers".** Ann Huff Stevens, an economics professor at the University of California, Davis In the book, Never Say Die: The Myth and Marketing of the New Old Age[2] stated; "You're at the bottom of the totem pole again." The book also quotes, Till von Wachter, ""most workers will not find new jobs that pay as much as their old jobs **– lifetime earnings will inevitable be lower as a result of a midlife employment interruption".**

Unlike Sampson plaintiff exhausted administrative remedies and filed an action in the Federal Court. Plaintiff in the instant case is homeless because plaintiff has not been able to find employment. Plaintiff income is fixed as plaintiff also prematurely began Social Security annuity. Plaintiff projected earnings with Apple of approximately $2000.00 per month would have allowed plaintiff to obtain housing. Plaintiff has not recovered from lost income and is homeless. Plaintiff stayed in a hotel in Secaucus, New Jersey where plaintiff had obtained a favorable monthly rate that is affordable given plaintiff's fixed income. However on October 3, 2012 plaintiff was illegally locked out of plaintiff room. The attached Warrant of Removal, **EXHIBIT H** shows that the Hudson County Court Special Civil Part granted the Warrant to remove plaintiff from the Hotel plaintiff stayed. Plaintiff Affidavit further attests to the hardship and emotional distress the actions caused plaintiff.

---

[1] Income Loss Persists Long After Layoffs
[2] Never Say Die:  The Myth and Marketing of the New Old Age by Susan Jacoby

In the instant case the claim is not simply that an employee has been discharged and thereby has suffered injuries normally compensable by money. Rather plaintiff has experienced emotional distress, loss of income that would have enabled plaintiff to obtain housing.   Plaintiff cannot recover; no monetary reward can compensate for the loss of housing, for the emotional pain and suffering, from the loss of constitutional rights, for other fundamental rights such as being counted in the census.   When plaintiff applied for employment with Apple one of plaintiff's objective was a source of income to find housing.  Plaintiff informed Apple's recruitment manager Tony Lagares that due to the high cost of housing in the New York area plaintiff would like to be considered for Specialist positions in Atlanta.   Because of the lower cost of housing, the income plaintiff would have earned would more than comfortably have allowed plaintiff to find housing in that area.

Reuters Ltd. v. United Press Int'l, 903 F.2d 904 (2d Cir. 1990). "[A] plaintiff **must demonstrate an actual and imminent threat of irreparable injury if the injunction were not granted**. The harm must not be remote or speculative, and the injury alleged must be one incapable of being fully remedies by money damages." 903 F.2d at 907.   Plaintiff has experienced/demonstrated actualized irreparable injury.   The granting of plaintiff request for injunctive relief will enable plaintiff to afford and obtain housing.

A tongue-in-cheek review in the Wall Street Journal, entitled "Revenge of the 60-Year-Old Has Beens," recently suggested that, "Once you're past 60, you should be thinking about making a graceful, dignified move towards the exit."  No wonder those who have attained the sixth decade of life may face the competitive job market not only with fear and trembling, but also with exquisite sensitivity for their legal rights.

Consequently, employers' time will also be well-spent considering in detail the ADEA and other laws that deal with duties to older workers."

In a Title VII case where the plaintiff's faced eviction, there are similar elements to the instant case, Carlos Aguilar; Eugenia Balcarcel; Dalton Castellano; Ralph Degracia; Apolonio Palencia; Blanca Rivera; And Enrique Valderama, Plaintiffs, v. Baine Service Systems, Inc., 538 F. Supp. 581, the court cited the standard for preliminary injunction in the 2nd Circuit, Jackson Dairy, granted preliminary relief for the plaintiff and stated; "If a preliminary injunction is not issued, plaintiffs will lose their jobs and sole means of financial support. See affidavits attached to Plaintiffs' Motion for Preliminary Injunction. The opportunity for unemployment insurance only exists if the defendants do not renew their allegedly empty promises of reemployment. The general rule is that an injunction should not issue when the remedy at law is adequate, Jackson Dairy, supra, 596 F.2d at 72. However, the harm generated by loss of employment extends beyond financial boundaries. The plaintiffs face eviction, cut-off of their utilities and the inability to provide for their children. "[In] many cases the effect on the complainant of several months without work... will constitute harm that cannot be adequately remedied by a later award of damages." Sheehan, supra, slip. op. at 5540. The plaintiffs' circumstances present ample support for a finding of irreparable harm."

Plaintiff circumstances in this case present overwhelming evidence in support of a finding of irreparable harm.

Finally, the Fifteenth Amendment ratified February 3, 1870 provided that, "The right of U.S. Citizens to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of **servitude**". Plaintiff Fifteenth Amendment rights have been abridged simply because plaintiff cannot obtain

employment so that plaintiff may afford housing and therein have an address so that plaintiff may register to vote, be counted.   That is irreparable!

## SUCCESS ON THE MERITS

The instant case is not a mixed motive case.  Plaintiff established a Prima Facie case.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual (over 40 years of age) or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. §§ 623 (a)(1), 631(a).

To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under "circumstances giving rise to an inference of discrimination." *See Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001).  See Terry v. Ashcroft, 336 F.3d 128 (2003).

Under either statute, once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) (ADEA). Thus, once the defendant has made a showing of a neutral reason for the complained of action, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern, 131 F.3d at 312.*

It is undisputed that plaintiff is over the age of 60 and protected by the ADEA.   It is also undisputed that plaintiff applied for positions with Apple and that Apple acknowledged plaintiff qualifications when Apple made a written offer to plaintiff for a Specialist position.  ¶ 12, Ex B.

It is also undisputed that plaintiff questioned and requested clarification on a statement in Apple's Intellectual Property Agreement, Ex C, that stated, "If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, worldwide license to any Prior Invention that is now or hereafter infringed by an Apple product, process, or method of doing business (hereinafter "Apple Product".  In response Apple forwarded to plaintiff an email from Trey Wichmann of Apple Compliance. ¶ 15 Ex D.

Plaintiff informed Mr. Kruoch and Mr. Martinez that plaintiff would need to obtain advice from an attorney.  Mr. Kruoch informed plaintiff that plaintiff would not be able to start on July 23, the date on the offer letter, and that the next time/date plaintiff could start would be August 6, 2011. ¶ **19.**

When plaintiff returned on August 1, 2011 to sign the IPA Ms. Brooks stated that all positions were filled.   On August 3, 2011 Ms. Brooks then stated that "most" positions were filled and that there were qualified applicants in the pipeline.

Plaintiff asserts that plaintiff was as qualified on August 3, as plaintiff was on July 19 when Apple made a written offer to plaintiff therefore questioned why plaintiff was not at the top of the pipeline of qualified candidates?

Apple stated that it was their discretion whether to offer plaintiff a position as plaintiff offer letter had expired.   Plaintiff further questioned, the reason the offer letter dated July 19, 2011 was only valid until Friday July 22, 2011 while Apple

**continued to actively recruit and call applicants to find out their interest in positions**.

Plaintiff signed the offer letter contingent on the IPA agreement and, a day later Apple sent plaintiff a welcome employee letter, ¶ 18, Ex. E.  Henceforth plaintiff believed that plaintiff was an Apple employee.

Apple stated that the offer letter plaintiff signed contingent on the IPA agreement was destroyed. ¶¶ 30 to 34.   Therein Apple violated Federal Record retention laws and destroyed evidence that would substantiate plaintiff claims.

Pursuant to U.S. Code 29 CFR § 1627.3(b)(1), Employer record retention requirements for ADEA are established by Federal law and states, "Every employer who in the regular course of his business, makes, obtain, or uses, any personnel or employment records related to the following shall except as provided in paragraph (b)(3) and (4) of this section, keep them for a period of 1 years from the date of the personnel action to which any records relate".

   (i)  "Job applications, resumes or any other form of employment inquiry whenever submitted to the employer in response to his advertisement or other notice of existing or anticipated job openings, including records pertaining to the failure or refusal to hire any individual".

   (ii) "Any advertisement or notices to the public or to employees relating to job openings, promotions, training programs, or opportunities for overtime work".

(3) "When an enforcement action is commenced under section 7 of the Act regarding a particular applicant or employee, the Commission or its authorized representative shall require the employer to retain any record required to be kept

26

under paragraph (b) (1) or (2) of this section which is relative to such action until the final disposition thereof".

Apple stated that the offer letter had expired and was destroyed, and is the reason Apple did not hire plaintiff.  What is Apple's response to the plaintiff questions in ¶ 34.  And, as discussed in ¶ 40 and Ex. G since plaintiff continued to be qualified what is the reason plaintiff was not hired when Apple staffed and opened the Grand Central store in December 2011 with 315 employees, and the Yonkers store in June 2012 with approximately 200 employees.

Additionally, Apple job opportunities website consistently showed current openings for Specialist positions at just about all New York retail stores and, all Metro Atlanta stores.

Jobs for all individuals in the current economic environment are difficult to find and multiple times more difficult for individuals protected under the ADEA.  Plaintiff alleges the reason Apple offered plaintiff a position was plaintiff discussions and statements that Apple's marketing focus is younger individuals, college students, and that Apple's workforce represents the demographic Apple wants to attract. The picture shown on Apple's Job Opportunities website, **EXHIBIT I** communicates/publishes Apple's hiring preference.

 "The McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination", as plaintiff has in the instant case. TransWorld v. Thurston, 469 U.S. 111 (1985).

| McDonnell Douglas Prima Facie Standard | Peterson V. Apple |
|---|---|
| | |
| Membership in a protected group | Achieved.  Plaintiff is over the age of 60 and protected by the ADEA, |
| Applied and was qualified for the jobs in question | Achieved.  Applied and Qualified established by Apple offer to plaintiff |
| Was subject to adverse action | Achieved. Plaintiff returned to sign the IPA. However, Apple stated no openings, then told "most" positions were filled and qualified candidates were in the pipeline while Apple continued to actively recruit |
| The circumstances give rise to an inference of discrimination | Achieved.  Apple staffed and opened two stores.  Grand Central 315 positions, Yonkers approximately 200 positions, and filled a significant number of Specialist positions in the Metro NYC area and, the Metro Atlanta area |

## BALANCING OF HARDSHIPS TIPPING DECIDEDLY TOWARD THE PARTY REQUESTING THE PRELIMINARY RELIEF

The Jackson Dairy analysis requires that after this court determines that both irreparable harm and sufficiently serious questions addressing the merits are present, a balance of hardships tipping towards the plaintiffs must be found before an injunction will issue.

Apple Inc., is a California Corporation established in 1977.  Apple Inc. and its wholly-owned subsidiaries designs, manufactures and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content an applications.   The Company sells its products worldwide through its retail stores, online stores, and direct sales force, as well as through third-party cellular network carriers, wholesalers, retailers, and value-added resellers.

Apple reported quarterly revenue of $35.0 billion and a quarterly net profit of $8.8 billion for the Third Quarter, July 2012.   The company has approximately 327 retail stores and about 30,000 of 43,000 Apple employees in the United States work in Apple stores.

Apple will suffer no relative expense if an injunction is granted.   By contrast, withholding injunctive relief to plaintiff would continue the hardship the denial of employment caused, and plaintiff will not be able to afford housing.   On balance, the equities favor the grant of injunctive relief to plaintiff.

For the all of the foregoing cited reasons plaintiff pray the court order injunctive relief for plaintiff as follows:

A.   Order that Apple immediately hire plaintiff in a Specialist or Business Leader position in the Atlanta area or location of plaintiff choice that has reasonable cost of living/housing

B.   Order Apple pay plaintiff half of the make whole remedies plaintiff is entitled; back pay, front pay and liquidated damages, and that plaintiff is immediately entitled to benefits

C.   Award attorney's fees and costs so that plaintiff may obtain legal consultation

D.   Award any other relief the Court determines appropriate and necessary

Respectfully submitted,

Andrea Peterson
P.O. Box 582
New York, NY 10108
917-504.6858
ajnpeterson@gmail.com

Dated:  October 14, 2012

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

---

Andrea Peterson, P.O. Box 582
New York, New York 10108

DOCKET NO:  12-CV-6467 (GBD)(GWG)

     Plaintiff

Vs.

**AFFIDAVIT OF ANDREA PETERSON**

Apple Inc., 1981 Broadway, New York, NY
10023, Apple Inc., One Infinite Loop,
Cupertino, CA 95014

     Defendants

---

Pursuant to 28 U.S.C. S 1746, I, Andrea Peterson hereby declare as follows:

1. I am over 60 years of age, and am competent to give this declaration.

2. I am the plaintiff in the legal action Andrea Peterson v. Apple Inc.

3. I am a member of a class of individuals protected by;

    a. The Age Discrimination in Employment Act (ADEA) of 1967, as codified, 29 U.S.C. SS 621-634 and,

    b. Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

    c. All Sections and Provision of New York State Human Rights Law, N.Y. Exec. §§ 290 to 297.

    d. All Sections and Provisions of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 Unlawful discriminatory practices, Chapter 1. Employment.

4. In January 2011 I applied for employment with Apple Computer.   In my email of March 4, 2011 I stated that I would like to be considered for positions at various locations in New York.

5. On July 18, 2012 Apple made a verbal job offer to me.

6. I completed new hire paperwork on July 19, 2012 and was given a written offer letter that stated by Friday, July 22, 2011, no later than 5:00 p.m., Apple must receive my written acceptance of the offer and that I was required that I sign Apple's Intellectual Property Agreement.

7. I informed Sarone Kruoch and Bryant Martinez that I had questions and requested clarification on some of the language of the IPA.   They told me that they would obtain clarification and advise me.  I signed the offer letter contingent on the IPA agreement.

8. On July 20 I received an email from Dana Brooks that forwarded the email of Troy Wichmann.  The email stated if I have questions I should consult with an attorney.  (Ex. D, Plaintiff Mtn. Show Cause Preliminary Injunction).

9. On July 20, 2012 I received an email from Apple that welcomed new employees and provided my training schedule.  (Ex. E. Plaintiff Mtn. Show Cause Preliminary Injunction).

10. On July 21, 2012 I returned to the Apple store to pick up copies of the documents I signed.   I discussed with Mr. Kruoch and Mr. Martinez, Mr. Wichmann'e email that stated that I should consult with an attorney.   Mr. Kruoch told me that I would not be able to start on July 23 and that the next date I would be able to

start was August 6, 2011.  I understood the dates to be when training for new

hires is scheduled.

11. I do not have an attorney, nor one on retainer so it took several days for me to

identify attorneys, send the IPA to them and request their advice.

12. My email to the attorneys stated;

Attached is the IPA.       My employment offer from Apple is contingent on my

signature.  I request clarification on the section that states Apple is granted a

"royalty-free, irrevocable, perpetual, worldwide license to any Prior Invention that

is now or hereafter infringed by an Apple product, process, or method of doing

business (hereinafter "Apple Product")..."  The word "if" used several times

creates too much uncertainty and opportunity for a claim to be made.

While I would like the job, I am perplexed that there is an expectation that I gift

my work. Specialist, the position offered, is not associated with my copyrighted

work.

13. One attorney told me that Apple is a big Corporation with lots of legal resources

and I should consider a document to protect myself.   Another attorney pointed

out that the IPA states; "if" one of three events takes place (see ¶ 20 Plaintiff Mtn.

Show Cause Preliminary Injunction).

14. On August 1, 2011 I returned to the Apple store to sign the IPA.  I was informed

by Sal that no one was in Human Resources and that he could not accept a

sealed envelope with the IPA.

15. On August 1, 2011, later in the day, Dana Brooks called me and stated all

positions were filled, and that my offer letter had expired.

16. On August 3, 2011 during a meeting with Dana Brooks she told me that "most" positions were filled and that they had qualified candidates in the pipeline. Ms. Brooks stated that Mr. Kruoch statement that the next date I would be able to start was August 6, was a date that I could start not that it was offered.

I objected and told Ms. Brooks that I completed all the paper work and I had questions on the IPA. Ms. Brooks told me that Mr. Wichmann's email provided the clarification I requested. I went over to the computer Ms. Brooks was reading from and requested that Ms. Brooks scroll down to the section of Mr. Wichmann's email that stated; "We can't advise people about the interpretation of this language, though -- the agreement is what it is. If they have questions about it, they would need to consult with their own counsel."

I wondered the reason Mr. Kruoch and Mr. Martinez with whom most of my interactions had been with were not in the meeting. A person who I was told is an Apple senior manager sat in the room during the meeting with his back to me. He did not participate in the meeting. As I was leaving I introduced myself to him and he told me his name is Mario.

17. I never received a call or email from Apple that requested a status or update on when or if I would sign the IPA.

18. On August 10, 2011 in a review of the documents I had picked up, I noticed that the offer letter I signed contingent on was not in the package. I called Apple and spoke with Mr. Kruoch. Mr. Krouch immediately acknowledged, stated it was the offer letter and that he would get it from Mr. Martinez and send it to me.

19. On August 11, 2011 Mr. Kruoch called me and stated that Ms. Brooks wanted me to send her an email requesting the letter.  I asked Mr. Kruoch to send me an email stating Ms. Brooks' request.

20. I did not receive the email from Mr. Kruoch so I sent the requested email to Ms. Brooks.  On August 15, 2011 I received an email, from Ms. Brooks that stated, "We discard all documents and do not retain paperwork onsite.  When your offer expired on July 22, your documents were properly discarded.  It is also my understanding that you previously requested all signed copies of all your documents on July 19 and you picked these documents up on July 20".

21. Because of Federal record retention laws, I thought Ms. Brooks meant that documents were not kept "onsite" so I sent Ms. Brooks another email that stated; "You are correct I picked up "some" documents on July 20.  After signing the new hire paperwork on July 19, I was on the bus heading back to New Jersey when I looked at the copies of the documents I was given and realized I did not have the docs I signed.  I informed Patricia that I would pick up the docs the next day which I did.

However, last week when I looked, the offer letter I signed, along with other new hire paperwork, contingent on... was not in the package.  When I called to request it from you last week, Sarone told me he would get it from Bryant and send it to me.

He called the next day and told me that you requested that I send you an email requesting the letter.  Your email states that you do not retain paperwork onsite.  Who, and or at what site should I request and pick up the paperwork, more specifically the offer letter I signed."

22. I received an email from Ms. Brooks on August 16, 2011 that stated; "Hi, as stated, when your offer expired we discarded all documents with your signature. These documents no longer exist. Sorry for the confusion."

23. I had phone conversations, and exchanged text and email messages with Tony Lagares, a Senior Manager of Apple Retail Human Resources from September 2, 2011 to November 11, 2011. I informed Mr. Lagares that I signed the offer letter contingent on the IPA Agreement, I returned to sign the IPA, and that I believe I am an Apple employee, and requested a position at another Apple store.

24. I informed Mr. Lagares because of the lower cost of living and that I had been unemployed for months, I wanted to be considered for a position in the metro Atlanta area and requested that he provide the names of People Managers so that I may schedule appointments with them.

25. For two (2) months I had voice, text, email and communications with Mr. Lagares without resolution. Mr. Lagares often stated he was traveling, going in a meeting… I did not get the sense that resolution of my HR issue was a priority. The menu key on my Nokia phone malfunctioned therefore I have been unable to access the text messages so that they may be included as part of this document. I request the Court grant a subpoena.

26. On November 11, 2011 I sent Mr. Lagares the attached email, **EXHIBIT 1.** I informed Mr. Lagares that my phone appointment with another senior manager, Ms. Smith had been rescheduled however a time for the call was not set. I stated that I did not believe Apple was taking my concerns serious, and that I told Karl, Ms. Smith's assistant of Mr. Lagares offer that I have discussions with

People (Hiring) Managers in Atlanta. I also asked Mr. Lagares who must be involved to reach resolution on my concerns.

27. In November 2011 Mr. Lagares informed me that he was calling on Ms. Smith's behalf. He stated that I am not an Apple employee. Mr. Lagares did not provide the names of People Managers.

28. I updated my Profile and application for Specialist, Business Specialist and Business Leader positions at multiple locations within a commuting distance of New York City and Metro Atlanta on Apple's Job Opportunities website.

29. In December 2011 I filed a Charge with the EEOC that was cross-filed with the New York Division of Human Rights.

30. I was not interviewed nor offered one of multiple positions Apple filled when Apple opened the Grand Central store, the Yonkers store, or positions consistently listed as current openings on Apple Job Opportunities website.

31. I believe that Apple discriminated against me due to my age. Aside the expired offer there were multiple opportunities for Apple to hire me.

32. I had planned to use the income from employment with Apple to meet the income to debt ratio criteria landlords and or mortgage companies require so that I may get housing.

33. I have not been able to get housing and therefore have had no choice but to continue staying in an Extended Stay hotel that is only affordable because of my contracted rate. I have not been able to establish an address so that I may vote, obtain a Drivers License, and be counted in the census and as a result my constitutional amendment rights have been violated.

34. I have felt inadequate, questioned myself, my belief that I have excellent skills, questioned my identify and have not contacted previous colleagues.   Despite doctors feedback that I am in excellent health I have night sweats and insomnia.

35. I have been under a considerable amount of emotional distress which was significantly increased on October 3, 2012 when HVM/ESA Extended Stay America locked me out of my room on their claim that I am in arrears and based on that obtained a Judgment .

36. I have suffered stress, humiliation and economic loss and as a result I am homeless.

37. I recently read and became aware that I could petition the Court for injunctive relief.

Pursuant to 28 U.S.C. §1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I certify that the exhibit presented in support of plaintiff motion is a true and correct copy.

Executed on October 14, 2012

Andrea Peterson
P.O. Box 582
New York, NY 10108
917-504.6858
ajnpeterson@gmail.com

**EXHIBIT 1**

From: **andrea peterson** <adjpeterson@gmail.com>
Date: Fri, Nov 11, 2011 at 3:12 PM
Subject: Status Denise Young Smith Call
To: alagares@apple.com

Hello Tony,

I have not spoken with Denise Smith.  Karl called and stated due to her meeting and travel schedule the October 25th call had to be rescheduled to November 3.  A concrete time for the call was not established.  I expressed to Karl that given the length of time there have been discussions without a clear resolution I do not believe that my concerns are being taken seriously by Apple.

I informed Karl of your offer that I have discussions with People Managers in Atlanta, and suggested that while waiting for the call with Denise that I begin those discussions, as also suggested to you.   He said he would speak with you and call me.  I have not received a call from him, and my follow up messages have not been returned.

Have the discussions with Atlanta People Managers been scheduled?  And, as I have not been able to speak with Denise, who must be involved to reach resolution of my concerns?

Sincerely,
Andrea Peterson


From: **andrea peterson** <adjpeterson@gmail.com>
Date: Wed, Jan 25, 2012 at 11:37 AM
Subject: Application Status
To: referrals@apple.com, Tony Lagares <alagares@apple.com>

Good morning,

I am writing to request your assistance in obtaining the name(s) and telephone numbers of Hiring Manager who I may contact to obtain the status of my employment application for several positions, applied for online in the Atlanta area, or schedule an interview.   Please advise.

Thank you
Andrea Peterson

From: <alagares@apple.com>
Date: Wed, Jan 25, 2012 at 11:37 AM
Subject: Business Travel - Delayed Response
To: adjpeterson@gmail.com

Hi,

Thank you for your email. I am currently away from the office and will be delayed in responding to email and voicemail.

For assistance with HR programs and services, see HRWeb or contact the HR HelpLine at: 408-974-7411 or 800-473-7411 or hrhelpline@apple.com.

Best Regards...

...Tony Lagares
Senior Manager
Apple Retail Human Resources


From: **andrea peterson** <adjpeterson@gmail.com>
Date: Thu, Jan 26, 2012 at 12:30 PM
Subject: Re: Application Status
To: Referrals at Apple <erpprofiler@apple.com>
Cc: Tony Lagares <alagares@apple.com>

Thanks for your response.   I sent the email because a few months ago I applied online for several positions.  Apple locations in Atlanta and the Atlanta area have been actively recruiting for months.  Some positions were posted in the past couple weeks.

An offer was made to me for a New York location which I believe indicates that I meet the qualifications for the Specialist position, and am a fit with the culture of the organization.  I also assumed since I previously received a written offer from Apple that I would receive higher consideration given my already established qualifications and fit.

Given the foregoing what might be the reason I have not been contacted?

Thanks for your assistance.
Andrea Peterson

From: **Referrals at Apple** <erpprofiler@apple.com>
Date: Wed, Jan 25, 2012 at 12:47 PM
Subject: Re: Application Status
To: andrea peterson <adjpeterson@gmail.com>
Cc: Tony Lagares <alagares@apple.com>

Hi Andrea,

It is against policy to give out Hiring Managers' names and phone numbers.  Your resume was
sent out to the hiring teams when Tony submitted you as a referral.  If they have an open
position that they feel you are a fit for, they will contact you directly.

Regards,
ERP Admin

From: **Referrals at Apple** <erpprofiler@apple.com>
Date: Tue, Jan 31, 2012 at 4:03 PM
Subject: Re: Application Status
To: andrea peterson <adjpeterson@gmail.com>
Cc: Tony Lagares <alagares@apple.com>

Hi Andrea,

Unfortunately we only track the incoming referrals which are automatically distributed to the
hiring teams based on what your friend chose for the departments you are listed in.  We do not
have any tracking information so we aren't able to give you a reason why you have not been
contacted yet.

Regards,
ERP Admin

From: **andrea peterson** <adjpeterson@gmail.com>
Date: **Tue, Mar 27, 2012 at 2:14 PM**
Subject: Application Update
To: erpprofiler@apple.com

Hello, I updated the Apple positions I would like to be considered today.  However I
was not able to remove positions on the Upper West Side in New York City.   Please
advise how I may remove that location.

Thank you.
Andrea Peterson

From: **Referrals at Apple** <erpprofiler@apple.com>
Date: Wed, Mar 28, 2012 at 1:05 PM
Subject: Re: Application Update
To: andrea peterson <adjpeterson@gmail.com>

Hi Andrea,

We are not able to remove the positions.  If you happen to get contacted by a Recruiter for that store, please just let them know you are not interested in that location any longer.

Regards,
ERP Admin

# EXHIBIT A

## Andrea Peterson

'P.O. Box 805913          ◆          Chicago, IL 60680          ◆          312-208-9401

September 20, 2006

Mr. Steve Jobs
CEO
Apple
One Infinite Loop
Cupertino, California 95014

Dear Mr. Jobs:

Recently I stopped in Apple's Michigan Avenue store in Chicago and was given a demonstration on how user friendly the transition from a PC to a Mac can be. I was impressed and pleased to see that some of the most often used applications, Microsoft Office Suite are the same and look no different on a Mac. The store personnel were proud to share, that the OS X has been virus free and that the Mac cannot be hacked another positive feature.

I must admit that I was simply window-shopping. As much as I would like to have a MacBook Pro my current financial position does not allow me to make a purchase. I would however like to explore how my value added input as a tester may be exchanged for a Mac.

The obvious question, why? And, what added value might I provide. Allow me to share a little about me!

- I represent the Baby Boomers a group of 78,000,000 or put another way, 1/3 of the U.S. population. Each day 7,912 Boomers turn 60. Boomers combined financial worth exceeds Trillions resulting in significant disposable income for travel, 2nd homes and other luxuries perhaps a Mac

- Most of Boomers experience has been on the PC. Statistics suggest individuals are less apt to change from what they are most familiar with without a good understanding or reason for change

- Apple's marketing campaign's does not seem to indicate a conscience strategy to target the Boomer market. If Boomers are buying Mac's it is not evident from the customer mix at stores like Apple's Michigan Avenue store. As an example, Apple offers a $200 discount to students, gives ipods etc. So, Apple recognizes this potential market but not the market of millions of retiring Baby Boomers?

- Boomers represent users, many who are retiring and are looking for a notebook as a desk top replacement due to among other things portability, are tech savvy and want to explore features that fit a post retirement lifestyle

- Boomers like the broader market are switching to a Notebook but may not consider a Mac due to the perceived learning curve and increased costs which may be 1/3 higher than PC products

- Boomers represent the market who may not be aware of any readily available data that provide a side by side comparison, PC/Mac, and would support either real or perceived increased purchase cost

- Boomers represent the market that is not aware of Apple Pro Care training and other benefits for new users.  At $99.00 for 52 weeks that equates to less than $2.00 per one hour session.   Boomers are also not aware that issues of identify theft from online use of credit card and/or other confidential data may be minimized by using a Mac.   I was not aware and suggest the market does not know this!

My interest is to be part of your test group focused on the Baby Boomer as a market segment with significant upside potential that should be fully explored.  In exchange for a MaxBook Pro I will provide my expertise, ongoing feedback and recommendations.

Please let me hear from you.  This is a WIN-WIN proposition!

Sincerely,


Andrea Peterson

# EXHIBIT B



July 19, 2011

Andrea Peterson
P. O. Box 582
New York, NY 10108

Dear Andrea:

Apple is delighted to offer you the position of Specialist. In your new position, you will report to Sarone Kruoch, with the effective start date of Saturday, July 23, 2011. We look forward to welcoming you to Apple.

## Compensation

Apple offers a highly competitive package of compensation and benefits. The details of your package are set forth below. Apple reserves the right to modify salaries and benefits from time to time as it deems necessary.

You will receive an hourly rate of (US) $15.95, and, when applicable, an overtime rate of (US) $23.925. All payments made will be less deductions required by law and payable every other week in accordance with Apple's standard payroll procedures.

## Benefits

As a part-time employee, you will be eligible to participate in Apple's benefits program. Enclosed is a Part-time Retail Benefits Program Summary with more details.

Upon hire, you may immediately enroll in the Apple 401(k) Plan to which both you and Apple contribute. Apple matches your contributions made through payroll withholding starting at 50 cents for each dollar you contribute up to 6% of eligible pay. As a convenience to you, you will be automatically enrolled in the Apple 401(k) Plan with a before-tax contribution of 3% of your eligible base pay, with contributions starting approximately 30 days after your employment with Apple begins. If you do not wish to be automatically enrolled in the Apple 401(k) Plan, or if you wish to contribute a different percentage of eligible pay, you may opt-out or change your contribution election at any time. In addition, you will be enrolled in an automatic increase program. This program will increase your contributions by 1% each year on the anniversary of your automatic enrollment date, to a maximum of 6%. You can opt out of this program at any time, or you can also choose to maintain the annual increase program after reaching the 6% maximum.

Participation in any of Apple's benefits and stock plans is subject to the written terms and conditions contained in the various plans. You will be given additional information regarding these benefits plans during your New Employee Orientation sessions.

Bridge of Service

If you're re-joining Apple, you may be eligible for credit for previous time worked at Apple or an Apple-designated affiliate. The amount of credit will be determined by your prior service and the length of time between your termination and the re-start date associated with this offer. Service credit will be used to calculate your vacation accrual rate, 401(k) Plan match, and service award eligibility.

## Conditions

This offer of employment is contingent on the following conditions.

- On your first day of employment, and possibly from time to time thereafter, you must show proof of identity and legal right to work in the United States as required by federal immigration law. If you are unable to provide documentation of your authorization to work in the United States, Apple may terminate your employment.

- Due to U.S. Department of Commerce requirements, if you're not a U.S. citizen, U.S. permanent resident, Canadian citizen, political refugee, or a political asylum holder, you will be required to sign an assurance regarding obligations not to export controlled technical data or software to certain countries. If you're a citizen of a restricted country (as identified by the Department of Commerce), Apple could be required to obtain an export license from the Department of Commerce. Apple will work with you to obtain this license within a time limit established by Apple. If for any reason Apple doesn't receive a license within the established time frame, Apple may terminate your employment.

- You must sign the Intellectual Property Agreement and return the signed agreement with this offer letter. Any exceptions or approvals required under the terms of the Intellectual Property Agreement must be approved by your division's vice president and Apple's Legal Department prior to your beginning work.

- We believe that every employee should use good judgment and exercise uncompromising integrity when conducting Apple business. By accepting this offer, you acknowledge that you have received and read Apple's Business Conduct Policy and that you agree to comply with its terms.

- You must receive a satisfactory background check in accordance with Apple policy.

If any of the above conditions are not satisfied, Apple may withdraw this offer of employment.

Your employment relationship with Apple will be at will. This means that either you or Apple may terminate the employment relationship at any time and for any or no reason with or without notice.

Your employment will be governed by and interpreted under the laws of the State of New York, without regard to conflict of law principles.

By signing this letter, you agree that these are the only terms and conditions of your employment and acknowledge that you have not relied upon any other promises or representations, except those made in this letter.

This offer of employment is valid until Friday, 07/22/2011. We must receive your written acceptance of this offer no later than 5:00 p.m. Pacific Time that day.

Andrea, please accept this offer by signing below. Return this letter along with the paperwork noted in the Forms to Complete section of this folder and confirm your start date with your recruiter. Be sure to retain copies for your personal records. If you have any questions regarding this offer or any of its enclosures, please contact me at 1-212-2093440.

Sincerely,


Bryant Martinez

Manager

On behalf of Apple Inc.


I accept the offer (sign below):


_____        July 23, 2011
Candidate Signature                             _____
                                                Expected Start Date

_____
Printed Full Candidate Name                     _____
                                                Date Signed

Apple Inc. | 1 Infinite Loop | Cupertino, California 95014 | 800.473.7411

# EXHIBIT C

If someone lists an invention as a "Prior Invention" on the IPA and does no further work on it while they are an Apple employee, then it's theirs and theirs alone, **except** as stated in the IPA:

**Intellectual Property Agreement**

This Agreement sets forth the agreements between you and Apple Inc. (Apple concerning any inventions you may make in connection with your employment by Apple and your treatment of Apple's confidential and proprietary information.  Apple has agreed to employ you (or if this Agreement is being executed after you have already been employed by Apple, to continue to employ you) on the condition that you agree to and will abide by the following terms and conditions for the duration of your employment by Apple (including, but not limited to, any leave of absence or other time off) and thereafter.

I.0 INVENTIONS.

As used in this Agreement, the term "inventions" means any and all inventions, ideas, and discoveries, including improvements, original works of authorship, designs, formulas, processes, computer programs, or portions thereof, databases, trade secrets and proprietary information, documentation, and materials made, created, conceived, or reduced to practice by you, whether alone or jointly with others.

a. Your Rights In Inventions. (i) Prior Inventions.  In the space provided below, or on a separate sheet attached to this Agreement, you may list all Inventions (a) that you made prior to your employment by Apple; (b) that you claim belong to you, or that you claim an ownership interest in, or to which you claim any other legal right or title; and (c) in which you wish to retain any claimed ownership or other legal rights ("Prior Inventions"). If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, worldwide license to any Prior Invention that is now or hereafter infringed by an Apple product, process, or method of doing business (hereinafter "Apple Product") if: (i) you were involved in the development or implementation of that portion of the Apple Product which infringes your Prior Invention, or (ii) you acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their development or implementation of the Apple Product, or (iii) upon first learning of Apple's use of your Prior Invention you do not immediately notify in writing your Apple vice president of Apple's infringing use of your Prior Invention and the need for a license thereto.

If you do not list a Prior Invention, you acknowledge and agree that no such Prior Invention exist and, to the extent such Prior Inventions do exist, you waive any and all rights or claims of ownership to such Prior Inventions.   You understand that your listing of any Prior Invention(s) here does not constitute an acknowledgement by Apple of the existence or extent of such Prior Invention(s), nor of your ownership of such Prior Inventions.   Please do not use this space to disclose an ongoing business or project, or a product that you are developing and/or distributing; such ongoing activity must be presented to your manager in writing, and approved in advance by your Apple vice president."

(ii) Future Employee Inventions.  Apple acknowledges and agrees, in accordance with applicable state law, that any inventions (a) that you develop entirely on your own time; and (b) that you develop without using Apple's or its subsidiaries' equipment, supplies, facilities, or trade secret information; and

(c) that do not result from any work performed by you for Apple or its subsidiaries; and (d) that do not relate, at the time of conception or reduction to practice, to Apple's or its subsidiaries' business or products, or to Apple's or its subsidiaries' actual or demonstrably anticipated research or development, will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple.

b. Apple Rights in Inventions. (i) Assignment of Inventions to Apple.  You agree that all inventions that (a) are developed using the equipment, supplies, facilities, or Proprietary Information of Apple or its subsidiaries; or (b) result from or are suggested by work performed by you for Apple or its subsidiaries; or (c) are conceived or reduced to practice during your employment by Apple and relate to the business and products, or to the actual or demonstrably anticipated research or development of Apple or its subsidiaries ("Apple Inventions"), will be the sole and exclusive property of Apple, and you will and hereby do assign all your right, title and interest in such Apple inventions to Apple.   You agree to perform any and all acts requested by Apple, if any, to perfect this assignment.  (ii) Disclosure. You agree to make full written disclosure promptly to Apple of any and all Apple inventions, (iii) Assignment of Moral Rights to Apple.  In addition, to the extent permitted by law, you hereby transfer and assign any "moral" rights that you have in any Apple Invention(s) under any copyright or other law, whether U.S. or foreign. You agree to waive and never to assert any such "moral" rights in Apple inventions during or after the termination of your employment by Apple.  You agree that Apple, it subsidiaries, and its licensees are not required to designate you as the author of any Apple Inventions when distributed. You also agree that Apple retains sole discretion with regard to know and for what purposes, if any, such Apple Invention(s) are used.

c. Protection of Apple Inventions. You agree (at Apple expense) to assist Apple in every proper way to obtain and to help Apple enforce patents, copyrights, and other legal protections for Apple inventions in any and all countries. You agree to promptly execute any documents that Apple may reasonably request for use in obtaining or enforcing such patents, copyrights, and other legal protections.  You acknowledge that all original works of authorship that are made by you (solely or jointly with others) within the scope of your employment by Apple, and that are protectable by copyright, are works made for hire, as that term is defined in the United States Copyright Act (17 U.S.C. §101).

# EXHIBIT D

From     UWSHR uwshr@apple.com
To        adjpeterson@gmail.com
Date     Wed, Jul 20, 2011 at 12:40 PM
Subject Intellectual Property Agreement question

Hi Andrea,

Per our conversation, below is the response we received from Trey Wichmann with our Compliance &
Business Conduct team. If this appropriately addresses your concerns please advise of your availability
to quickly stop by today to complete your new hire paperwork.
If you have any additional questions please feel free to contact us by 5p today.


Hi Dana,

If someone lists an invention as a "Prior Invention" on the IPA and does no further work on it while they
are an Apple employee, then it's theirs and theirs alone, except as stated in the IPA:

If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual,
worldwide license to any Prior Invention that is now or hereafter infringed by an Apple product, process,
or method of doing business (hereinafter "Apple Product") if: (i) you were involved in the development
or implementation of that portion of the Apple Product which infringes your Prior Invention, or (ii) you
acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their
development or implementation of the Apple Product, or (iii) upon first learning of Apple's use of your
Prior Invention you do not immediately notify in writing your Apple vice president of Apple's infringing
use of your Prior Invention and the need for a license thereto.

We can't advise people about the interpretation of this language, though -- the agreement is what it is.
If they have questions about it, they would need to consult with their own counsel.

As for what happens if she decides to update the invention while she's an Apple employee:  Given that it
appears to be a software system that would be relevant to Apple's business (since we have and develop
internal HR tools and systems), this is something where, under the Business Conduct Policy, she would
need to get advanced approval from Apple Legal and a Sr. VP before she could do any work on it.  As
part of that approval process, there typically would be discussions about IP ownership issues and
possible licenses for Apple to the invention.

Let me know if you have any additional questions.

Thanks,
Trey


Thank You,
Bryant Martinez
Human Resources Admin
⬛ Apple Store Upper West Side/R251
(Main) 212.209.3400 (Office) 212.209.3440 (Fax) 212.209.3441



# EXHIBIT E

From: **Ken Cooke** <kcooke@apple.com>
Date: Wed, Jul 20, 2011 at 6:00 PM
### Subject: Welcome to Apple!
To: heather.pedersen@yahoo.com, virgolibranyc@gmail.com, betz.chan@gmail.com, kking24@me.com, patty3317@gmail.com, jeffrey.santoro@mac.com, ericjcarvalho@gmail.com, curtis.alexandra@gmail.com, matt.savoca@gmail.com, akmuro@gmail.com, cl58528n@pace.edu, katherinepaladino@gmail.com, DaveBellevue@gmail.com, shannon@sparkletelevision.com, adjpeterson@gmail.com, michaeljcrowley@yahoo.com, samasumu@gmail.com, eariza90@gmail.com
Cc: Training Team <fifthavenuetraining@group.apple.com>, Laura Fronczke <lauraf@apple.com>, Marissa Morris <marissa_morris@apple.com>, Sarone Kruoch <kruoch@apple.com>, Dana Brooks <dana_brooks@apple.com>, Jessica Bochner <bochner@apple.com>, Rusty Buehler <rbuehler@apple.com>, Erin Hefner <ehefner@apple.com>, Carrie Gorman cgorman@apple.com



## Hello Apple Store employees,

My name is Ken Cooke, and I am writing to inform you of your upcoming training. **This email contains the details for the program you will attend to prepare you for the dynamic experience of working for Apple.**

Training Locations

Classroom Training
Residence Inn Times Square, in the Bryant Park Room.

Training Schedule

Saturday, July 23rd, 9:00 AM to 6:00 PM. Meet at Residence Inn.

Sunday, July 24th, 9:00 AM to 6:00 PM. Meet at Residence Inn.

Monday, July 25th, 9:00 AM to 6:00 PM. Meet at Residence Inn.

Tuesday, July 26th, 9:00 AM to 6:00 PM. (NYC Stores Only) Meet at Residence Inn.

Please note that writing materials will be provided. Water will also be provided, however, the venue does not allow outside food or drink. Finally, this will be an eight hour classroom

experience so you should dress comfortably, as you will in your store. If you have any other questions, please email us.

We are excited to get started and hope you are as well.

Kenneth Cooke, Trainer
☐ Retail | Human Resources | Fifth Avenue

# EXHIBIT F

From: **andrea peterson** <adjpeterson@gmail.com>
Date: Fri, Aug 12, 2011 at 9:40 AM
Subject: Time to Pick Up Document
To: dana_brooks@apple.com

Hello Dana,

This email is in follow up to my messages, left with your office, that I would like to pick up the letter I signed, contingent on...  It is one of the documents that I requested copies of, and was not in the package I was given.  I would like to stop by and pick it up on Tuesday, August 16.  Please advise if there is a particular time you would like me to come.

Thank you.
Andrea Peterson
917-504-6858


From: <dana_brooks@apple.com>
Date: Fri, Aug 12, 2011 at 9:40 AM
Subject: Dana Brooks * Away from my mail
To: adjpeterson@gmail.com

Hello,

I will out of the office beginning Monday August 8 thru Friday August 12, 2011.  I return Monday August 15, 2011. During this time I'll have no access to voicemail and limited access to email.
In my absence, If you require immediate HR attention, please contact Patricia Bailey,(Patricia_bailey@apple.com),or Bryant Martinez, (bmartinez@apple.com),  (212) 209-3440.

Thank you,
Dana


From: <UWSHR@apple.com>
Date: Tue, Aug 16, 2011 at 9:32 AM
Subject: Acknowledgment of your e-mail.
To: adjpeterson@gmail.com

This confirms receipt of your message sent to UWSHR@apple.com. As a reminder this mailbox is for timecard corrections, requests to apply vacation/sick pay and general HR related inquiries.

The HR team makes every effort to respond to all inquiries in a timely manner. Please note that a response may take up to 72 hours.

Regards,

Human Resources

Upper West Side

From: **Dana Brooks** <dana_brooks@apple.com>
Date: Mon, Aug 15, 2011 at 3:06 PM
Subject: Re: Time to Pick Up Document
To: andrea peterson <adjpeterson@gmail.com>
Cc: UWS HR <UWSHR@apple.com>

Hi Andrea,

**the documents you've requested are no longer available. We discard all documents and do
not retain paperwork onsite.** When your offer expired on July 22, your documents were
properly discarded. It is also my understanding that you previously requested all signed copies of
all your documents on July 19 and you picked these documents up on July 20.

Dana

**Dana Brooks**
Associate Human Resources Leader
dana_brooks@apple.com
(212)209-3440 * Office * (212)209-3400 * Main * (212)209-3441 * Fax
 Apple Store Upper West Side



AUGUST 15, 2011      I SENT THE FOLLOWING EMAIL TO DANA.   I RECEIVED AN
                     AUTOMATED MESSAGE THAT IT WENT INTO THE GENERAL HR
                     MAILBOX AND MIGHT    NOT BE REVIEWED FOR SEVERAL DAYS SO
                     RESENT IT TO DANA'S ACCOUNT

From: **andrea peterson** <adjpeterson@gmail.com>
Date: Tue, Aug 16, 2011 at 9:32 AM
Subject: Re: Time to Pick Up Document
To: Dana Brooks <dana_brooks@apple.com>
Cc: UWS HR <UWSHR@apple.com>

Hello Dana,

**You are correct I picked up "some" documents on July 20. After signing the new hire
paperwork on July 19, I was on the bus heading back to New Jersey when I looked at the
copies of the documents I was given and realized I did not have the docs I
signed. I informed Patricia that I would pick up the docs the next day which I did.**

However, last week when I looked, the offer letter I signed, along with other new hire paperwork, contingent on... was not in the package.  When I called to request it from you last week, Sarone told me he would get it from Bryant and send it to me.

He called the next day and told me that you requested that I send you an email requesting the letter.   Your email states that you do not retain paperwork onsite.  Who, and or at what site should I request and pick up the paperwork, more specifically the offer letter I signed.

Thank you.
Andrea Peterson

From: **andrea peterson** <adjpeterson@gmail.com>
Date: Tue, Aug 16, 2011 at 9:41 AM
Subject: Re: Time to Pick Up Document
To: Dana Brooks <dana_brooks@apple.com>

Dana, I just received a messsage that the below email, sent to you a few minutes ago, went into Apple's HR mail and may not be reveiwed for several days.

Hello Dana,

You are correct I picked up "some" documents on July 20.   After signing the new hire paperwork on July 19, I was on the bus heading back to New Jersey when I looked at the copies of the documents I was given and realized I did not have the docs I signed.  I informed Patricia  that I would pick up the docs the next day which I did.

However, last week when I looked, the offer letter I signed, along with other new hire paperwork, contingent on... was not in the package.  When I called to request it from you last week, Sarone told me he would get it from Bryant and send it to me.

He called the next day and told me that you requested that I send you an email requesting the letter.   Your email states that you do not retain paperwork onsite.   Who, and or at what site should I request and pick up the paperwork, more specifically the offer letter I signed.

Thank you.
Andrea Peterson

AUGUST 16, 2011       I RECEIVED THE FOLLOWING EMAIL RESPONSE FROM DANA.

From: Dana Brooks <dana_brooks@apple.com>
Date: Tue, Aug 16, 2011 at 3:46 PM
Subject: Re: Time to Pick Up Document

**To: andrea peterson <adjpeterson@gmail.com>**
**Cc: UWS HR <UWSHR@apple.com>**

**Hi, as stated, when your offer expired we discarded all documents with your
signature.  These documents no longer exist.  Sorry for the confusion.**

**Regards,**

**Dana**
**Dana Brooks**
**Associate Human Resources Leader**
dana_brooks@apple.com
(212)209-3440 * Office * (212)209-3400 * Main * (212)209-3441 * Fax
 Apple Store Upper West Side



# EXHIBIT G

# THE WALL STREET JOURNAL.
WSJ.com

## Apple Opens New York Grand Central Store

December 9, 2011, 4:02 p.m. ET

By SHARA TIBKEN



At 23,000 square feet, Apple's newest store in Grand Central Station is one of the biggest Apple outlets and the fifth store in New York City. Lauren Goode reports on digits.  Apple Inc. opened its latest retail store Friday in New York's historic Grand Central Terminal to hundreds of eager shoppers from around the country who had been waiting in line for as long as a day.

Apple said 2,500 people were waiting in line before the opening, and the store had nearly 4,000 visitors before noon.   The first person in line, a 19-year-old man from Albany, N.Y., got there at 9:44 a.m. Thursday. A few spots down in line was a retired gentleman from California who got there at noon Thursday and had been to 30 store openings.

The latest store, Apple's fifth in Manhattan, adds to the company's footprint of more than 300 locations world-wide. The Cupertino, Calif., maker of the iPhone and iPad continues to expand its retail locations, counting on the popularity of its devices to drive traffic to its stores. In turn, the retail stores have boosted sales of its products by giving consumers an opportunity to try the devices and interact with Apple experts.



More people now visit Apple's stores in a single quarter than the 60 million who visited Walt Disney Co.'s biggest theme parks last year, according to data earlier this year from Apple and the Themed Entertainment Association. Bob Bridger, Apple's vice president of retail and real estate development, told AllThingsD that Apple has seen more than 12 million visitors in its New York stores this year, and more than 300 million visitors world-wide.

The crowd that had waited outside the new Grand Central store remained orderly during the night, even when they were forced to leave the waiting area between 2 a.m. and 5 a.m.



The store—one of Apple's largest at 23,000 square feet—features sleek tables for product testing and two Genius Bars for technical support. One element of this Apple store that's different from others is 15-minute express classes on Apple products for commuters looking to kill some time.

Apple's stores have been one of the anchors of the company's success and have grown at a time when many other retailers have struggled. In 2010, Apple's retail sales, excluding online, jumped 70% to $11.7 billion, handily exceeding the overall retail industry's sales growth of 4.5%. In 2010, retail sales represented about 15% of Apple's total revenue of $76.3 billion

"With so many retailers closing stores and diminishing their footprint in a slow-growing economy, Apple has been able to forge ahead," said Ken Perkins, president at retail research firm Retail Metrics.

Consumer demand for Apple's products has fueled the company's retail success, but the stores also have contributed much to the devices' popularity.



Customers shopped on the opening day of the new Apple store in Grand Central Station in New York Friday.

Jen-Hsun Huang, chief executive of chip maker Nvidia Corp., recently said Apple's stores have contributed to the iPad dominating the tablet market. He added that one of the biggest challenges facing tablet makers in the U.S. is how best to sell the devices when they don't control the stores.

Sony Corp. Chief Executive Howard Stringer echoed Mr. Huang, saying that trying out products is a key factor to getting customers to buy them, and that it's difficult to rely on retailers such as Best Buy to provide that experience.  "That's why we started our own stores," Stringer said last month. "We did it a long time ago and didn't do terribly well, but we're getting much better."

Apple's new store overlooks Grand Central's Main Concourse from the east and northeast balconies of the terminal. The store will include rooms dedicated to some of the company's personal services, including how to set-up Apple products. It also will offer a personal pickup service that allows commuters using the Apple Store app to make a purchase and then pick it up immediately upon arrival.

The Grand Central location will employ 315 people. As of Sept. 24, the end of Apple's fiscal year, the company's retail segment had about 36,000 full-time employees.

In July, the Metropolitan Transportation Authority approved a 10-year lease with the company for the store. The company paid chef Charlie Palmer's Metrazur $5 million to exit its lease on the space eight years early.

—Ian Sherr and Lauren Goode contributed to this report.

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved

# EXHIBIT H

Docket No.: LT-001864-12

THE JOHNSON AKM MGM
Plaintiff(s) - Landlord(s)

- vs -

PETERSON ANDREA
Defendant(s) - Tenant(s)

123 PLAZA DRIVE
SUITE 504
SECAUCUS  NJ  07094

Superior Court of New Jersey
Law Division, Special Civil Part
Landlord/Tenant Section, HUDSON County

575 NEWARK AVE RM 711
JERSEY CITY, NJ  07306
Telephone:  (201) 795-6680

>>>>> WARRANT OF REMOVAL <<<<<

To: THEODORE S. JOHNSON
    (Special Civil Part Officer)

    You are hereby commanded to dispossess the tenant and place the landlord in full possession of the premises listed above. Local police departments are authorized and requested to provide assistance, if needed, to the officer executing this warrant.

To: ANDREA PETERSON
    (Tenant(s))

    You are to remove all persons and property from the above premises within three days after receiving this warrant. Do not count Saturday, Sunday and holidays in calculating the three days. If you fail to move within three days, a court officer will thereafter remove all persons from the premises at any time between the hours of 8:30 A.M. and 4:30 P.M. on or after _____ (month) __ (day) __ (year). Thereafter, your possessions may be removed by the landlord, subject to applicable law (N.J.S.A. 2A:18-72 et seq.). The 3 day provision applicable to residential tenants does not apply to commercial property. commercial tenants may be evicted at the time the warrant is served.

    It is a crime for a tenant to damage or destroy a rental premises to retaliate against a landlord for starting an eviction proceeding in court and in addition to imposing criminal penalties the court may require the tenant to pay for any damage.

    You may be able to stop this warrant and remain in the premises temporarily if you apply to the court for relief. You may apply for relief by delivering a written request to the Clerk of the Special Civil Part and to the landlord or landlord's attorney. Your request must be personally delivered and received by the Clerk within three days after this warrant was served or you may be locked out. Before stopping this warrant, the court may include certain conditions, such as the payment of rent.

    You may also be eligible for housing assistance or other social services. To determine your eligibility, you must contact the welfare agency in your county at
HUDSON COUNTY BOARD OF SOCIAL SERVICES, 100 NEWKIRK STREET,
JERSEY CITY, N.J. 07306, telephone number (201) 420-3000

    Only a court officer can execute this warrant. It is illegal and a disorderly person's offence for a landlord to padlock or otherwise block entry to a rental premises while a tenant who lives there is still in legal possession. A landlord can only do these things in a distraint action involving non-residential premises. If your property has been taken or you have been locked out or denied use of the rental premises by anyone other than a court officer who is executing a warrant of removal you can contact the Special Civil Part Clerk's Office for help in (a) requesting an emergency order to return your property and/or get you back into your home; and/or (b) filing a lawsuit requesting a judgment for money.

    If you do not have an attorney, you may call the LAWYER REFERRAL SERVICE at (201) 798-2727. Si Ud. puede pagar los servicios de un abogado, pero no conoce a ninguno, puede llamar a las oficinas del Servicio de Recomendacion de Abogados del Colegio de Abogados de su Condado. Telefono: (201) 798-2727. If you cannot afford an attorney, you may call HUDSON LEGAL SERVICES at (201) 792-6363. Si Ud. no puede pagar un abogado, puede llamar a Servicios Legales. (201) 792-6363.

Docket No.: HUD LT-011864-12                    Superior Court of New Jersey

ESG SECAUCUS AKA HDM        (Landlord)    Attorney :

                                          DRESSLER & DYER
                                 Address : 60 STATE HIGHWAY 27
                                           EDISON NJ 08620

                                 Telephone: (732) 494-8555

A person commits a disorderly person's offense if he or she does any of the following
things after being warned by a law enforcement officer or other public official that they
are illegal:

   (1) illegally evicts a residential tenant without a warrant of removal issued by a court or
      the consent of the tenant; or

   (2) refuses to immediately let the tenant who was evicted this way back into the premises
      to live there.

"Illegal eviction" means to enter onto or into the rental premises and hold it by:

   (1) any kind of violence including threatening to kill or injure the tenant;
   (2) words, circumstances or actions which are clearly intended to incite fear,
      apprehension or a sense of danger in the tenant;
   (3) putting the personal property or furniture of the tenant outside;
   (4) entering peacefully and then, by force or threats, putting the tenant out;
   (5) padlocking or changing the locks;
   (6) shutting off vital services such as heat, electricity and water or causing
      them to be shut off; or
   (7) any means other than a court officer executing a warrant of removal issued by a court

A person who is convicted of an offense under this section more than once within a
two-year period is guilty of a crime of the fourth degree.

To Law Enforcement Officers

   Tenants evicted without a warrant of removal are entitled to reenter and reoccupy the
premises and shall not be considered trespassers or chargeable with any offense provided
that a law enforcement officer is present at the time of reentry. It is the duty of the
officer to prevent the landlord or anyone else from obstructing or hindering the reentry
and re-occupancy of the dwelling by a tenant who was evicted without a warrant of removal
executed by a court officer.

Dated: OCT 1 0 2012                 Witness   Mary K. Costello
                                                        (Judge)

RUPERT HALLER, CLERK OF THE SPECIAL CIVIL PART

CERTIFICATION OF SERVICE AND EXECUTION OF WARRANT OF REMOVAL

I hereby certify that I (check as applicable) __ served __ executed
this warrant of removal as follows:

Date First Served:   9/11/12          Method of Service:
If Reserved, Why:                     Must Vacate By:         10:30
Date and Time Executed:               Date Executed Warrant Posted:
Date Executed Warrant Served on Tenant:   Date Executed Warrant Served on Landlord:
Mileage Charge for Execution: $       Additional Services Charge: $
Additional Services Performed:

                                 Signature of Special Civil Part Officer

                                 Printed or Typed Name of Officer

# EXHIBIT I



**Jobs at Apple**

Store   Mac   iPod   iPhone   iPad   iTunes   Support   Q   Start your search

Corporate   Retail   Students

## A store like no other. A career like no other.

Join us at the Apple Retail Store, the unique gathering place where people come to discover Apple products. Show your passion and expertise as you connect customers with our products and help integrate products

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

_____

Andrea Peterson, P.O. Box 582                    DOCKET NO:  12-CV-6467 (GBD)(GWG)
New York, New York 10108

      Plaintiff

Vs.

Apple Inc., 1981 Broadway, New York, NY          **NOTICE OF FILING**
10023, Apple Inc., One Infinite Loop,
Cupertino, CA 95014

      Defendants

_____

I Andrea Peterson, Pro Se hereby certify that on October 15, 2012 I served a copy of

Plaintiff Motion for Order to Show Cause Preliminary Injunction and Affidavit to:

      Ali Ayazi, Attorney for Apple Inc.

by hand delivery at the parties Schedule Conference, in Courtroom 17-A, United States

Courthouse, 500 Pearl Street, New York, New York.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____                        Dated: October 15, 2012
Andrea Peterson
P.O. Box 582
New York, NY 10108
917-504-6858
ajnpeterson@gmail.com