UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────

Andrea Peterson, P.O. Box 582                    DOCKET NO:  12-CV-6467 (GBD)(GWG)
New York, New York 10108

      Plaintiff

Vs.
                                                 **PLAINTIFF MOTION FOR ORDER TO**
Apple Inc., 1981 Broadway, New York, NY          **SHOW CAUSE PRELIMINARY INJUNCTION**
10023, Apple Inc., One Infinite Loop,
Cupertino, CA 95014

      Defendants
───────────────────────────────

Plaintiff moves by order to show cause for a preliminary injunction pursuant to Fed. R.

Civ. P. Rule 65, and pursuant to the ADEA 29 626 (b).  Plaintiff further requests that

pursuant to Rule 65 (3) that, "the hearing be set at the earliest possible time taking

precedence over all other matters except hearings on older matters of the same

character".

## PLEADING STANDARD

Pleadings in the case are being filed by Plaintiff In Propria Persona, wherein pleadings

are to be considered without regard to technalities.   Propria pleadings are not to be

held to the same high standards of perfection as practicing lawyers.   See Haines v.

Kerner 92 Sct 594, also See Power 914 F2d 1459 (11th Cir.1990) also See Hulsey v.

Ownes 63 F3d 354 (5th Cir 1995).   Also See In Re: Hall v. Belmon 935 F.2d 1106 (10th

Cir. 1991).

## STANDARD FOR PRELIMINARY INJUNCTION

The Court of Appeals for the Second Circuit has recently commented on the standards

for a **preliminary injunction** as follows:

The purpose of a **preliminary injunction** is to maintain the status quo pending a final determination on the merits. It provides relief which is 'interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness.

Citing from Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir. 1979), "The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See* Caulfield v. Board of Education, 583 F.2d 605, 610 (2d Cir. 1978); See also New York v. Nuclear Regulatory Commission, 550 F.2d 745, 750, 755 (2d Cir. 1977); Triebwasser & Katz v. American Telephone & Telegraph *Co*. 535 F.2d 1356, 1358-59 (2d Cir. 1976). As to the kind of irreparable harm that the party seeking an injunction must show, the language of some past cases has suggested to some a spectrum ranging from possible to probable, which is defined as "not remote or speculative but . . . actual and imminent."

In the precedent setting Supreme Court case.  Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937, 938, 39  [*1072] L. Ed. 2d 166 (1974), the court held that a mere loss of income or damaged reputation would fall short of the type of irreparable injury that is necessary for issuance of a temporary injunction as requested in this particular case.  Further, Sampson holds that mere injury, however substantial in terms of money, time and energy necessarily expended in the absence of an injunction, is not enough.  The Court said that the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the

claim of irreparable harm.   See also the courts analysis in Callicotte v. Carlucci, 698 F.Supp. 94.

An Eastern District of New York case stated that to obtain a preliminary injunction a discharged employee must show that he or she (1) has very little chance of securing further employment; (2) has no personal or family resources at [his or] her disposal; (3) lacks private unemployment insurance; (4) is unable to obtain a privately financed loan; (5) is ineligible for any type of public support or relief ... and (6) [is affected by] any other compelling circumstances which weigh heavily in favor of granting interim equitable relief. In essence the plaintiff must quite literally find [himself or] herself being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm. Williams v. State University of New York, 635 F.Supp. 1243, 1248 (E.D.N.Y. 1986).

Another line of cases in the Fifth Circuit, Hayes, Culpepper, and Murry, involve employees who, having exhausted EEOC or other administrative remedies, have filed Title VII actions in the district courts seeking final adjudication on the merits.  These cases hold that where an employee with an action in this posture petitions the court for a preliminary injunction, the element of irreparable injury will be presumed.  We find that the Sampson, Parks, and Morgan decisions are inapplicable when, as here, the employee has exhausted all administrative remedies and has filed suit in the district court.

In United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969), this court stated:  "Where ... the statutory rights of employees are involved and an injunction is authorized by statute and the statutory conditions are satisfied ... the usual prerequisite of irreparable injury need not be established and the agency to

whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction.... We take the position that in such a case, irreparable injury should be presumed from the very fact that the statute has been violated.  Whenever a qualified ... employee is discriminatorily denied a chance to fill a position for which he is qualified and has the seniority to obtain, he suffers irreparable injury and so does the labor force of the country as a whole."

## CASE BACKGROUND

1. In early January 2011 plaintiff was in Apple retail store located on Fifth Avenue at 59th Street.   Plaintiff was surprised when plaintiff saw a mature sales representative and commented to her plaintiff surprise that Apple hires mature Sales Associates/Specialists.

2. Plaintiff chatted with Toni for a while and told her about a letter plaintiff wrote to Steve Jobs years prior in which plaintiff stated that each day 7,912 Baby Boomers with a combined financial worth that exceeds trillions turn 60 and that Apple's marketing campaign's does not indicate a conscience strategy to target this market.  Based on plaintiff visits to Apple stores, Apple employees represent the demographic that Apple wants to attract, markets to.  Plaintiff letter, **EXHIBIT A** summarized that most boomers are PC users, and as many retire they would be in the market for a notebook as a desktop alternative due to among other things portability.

3. Toni introduced plaintiff to some of her colleagues who shared their diverse backgrounds, and that Apple does not look for individuals with technical background but are more interested in individuals with a diversity of experiences.

Toni shared how she collaborates and draws upon the strengths of her team members' background and knowledge in response to customer's questions and encouraged plaintiff to apply for a job.  Toni stated that employee referrals are given first consideration.   Toni and her colleagues appeared to be considerably lower than plaintiff age however plaintiff decided to apply.

4. On February 17, 2011 plaintiff received an email from referrals@apple.com that stated, "Hi Andrea, Your friend Toni, thinks you'd be a good fit for Apple and has sent us your resume. Apple recruiters have access to your resume and if they find a good match between your experience and an open position, a recruiter will contact you directly. We'll keep your resume in our database for future consideration".

5. In an email dated March 4, 2011 plaintiff responded to Apple.  "Thanks for your email alerting me that Toni referred me and thinks that I would be a good fit for Apple.  I do to.  I would like to be considered for the Expert and Specialist positions that are currently open at various locations in New York.  Please let me know when we may meet to explore the ways the diversity of my skills and experience would be an asset to Apple".

6. On June 28, 2011 plaintiff received an email from Joe Ferry, the Recruitment Manager, New York City for Apple.   His email stated; "My name is Joe Ferry and I am a recruiter at Apple for our Manhattan Apple Retail Stores.  After reviewing your resume, I would like to invite you to attend our invitation-only recruiting seminar for the NYC Apple Stores as the first step in the interview process. Our team is currently seeking qualified Specialists and Inventory Specialists for our NYC Apple stores".

7. On June 30, 2011 the recruiting session was not a traditional recruitment interview.   In addition to Mr. Ferry, several Apple representatives attended. Approximately twenty people (approximate average age 30) who were in attendance were broken down in groups.  Each group was given a scenario of a hypothetical customer and asked to decide what products would be recommend, and what additional products would be proposed to the customer.  Each team made presentations to the overall group.

8. At the end of the session plaintiff met with Mr. Ferry and again stated plaintiff interest in working for Apple.  Plaintiff shared plaintiff surprise in seeing a mature Associate at the Apple store in January, and that plaintiff was encouraged to apply.  Plaintiff also told him about the letter plaintiff sent to Steve Jobs in which plaintiff discussed Apple's marketing focus, and that Apple's workforce represents the younger demographic that Apple markets to, and plaintiff suggestion that Apple recognize the potential market of millions of retiring Baby Boomers.

9. On July 6, 2011 Sarone Kruoch a Human Resource person from Apple's Upper West side called plaintiff and requested that plaintiff send him plaintiff resume. Mr. Kruoch scheduled plaintiff for an interview with Charles Kelly at Apple's Regional headquarters office, 401 W. 14th Street.

10. In July 2011 plaintiff was interviewed by Charles Kelly and another Apple manager.

11. On July 18, 2011 Sarone Kruoch called, and verbally offered plaintiff a Specialist position at Apple's Upper West side store at 1981 Broadway.   Mr. Kruoch asked

plaintiff to come in to complete New Hire paperwork.    He also told plaintiff that plaintiff should bring a current Passport.

12. On July 19, 2011 plaintiff was given a written Offer Letter **EXHIBIT B**, and completed New Hire paperwork.   One of the documents was an Intellectual Property Agreement (IPA).  Where indicated on the form plaintiff inserted plaintiff Copyright Registration Number and listed some examples of the Copyright Application as; Curriculum Development, Performance Management, Training and Development, Competency Development…

13. Plaintiff informed Mr. Kruoch and another HR representative, Bryant Martinez of plaintiff concern with the language of the IPA, (**EXHIBIT C, 2 pages of the IPA**) "if you do list such prior inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, worldwide license to any prior invention that is now or hereafter infringed by an apple product, process, or method of doing business". It sounded to plaintiff that plaintiff would be giving Apple a royalty-free, irrevocable…use of plaintiff Copyright.  Mr. Kruoch and Mr. Martinez informed plaintiff that they would obtain clarification on this statement.  Plaintiff completed the new hire paperwork and signed the offer letter, contingent on agreement on the IPA.

14. On the bus back to New Jersey plaintiff opened the documents plaintiff was given.   The New Hire documents plaintiff signed were not included therefore plaintiff called and spoke with Patricia Bailey.  Plaintiff told Ms. Bailey that plaintiff would pick up the documents on Thursday (referencing July 21) when plaintiff would be in New York again.

15. On July 20, 2011 to respond to plaintiff request for clarification of the IPA, Mr.

Martinez forwarded the attached email **EXHIBIT D**.   The email stated:

"Hi Andrea, Per our conversation, below is the response we received from Trey

Wichmann with our Compliance & Business Conduct team. If this appropriately

addresses your concerns please advise of your availability to quickly stop by

today to complete your new hire paperwork.

If you have any additional questions please feel free to contact us by 5p today.

Hi Dana,

If someone lists an invention as a "Prior Invention" on the IPA and does no

further work on it while they are an Apple employee, then it's theirs and theirs

alone, **except as stated in the IPA**:

If you do list such Prior Inventions, you hereby grant to Apple a royalty-

free, irrevocable, perpetual, worldwide license to any Prior Invention that is now

or hereafter infringed by an Apple product, process, or method of doing business

(hereinafter "Apple Product") if: (i) you were involved in the development or

implementation of that portion of the Apple Product which infringes your Prior

Invention, or (ii) you acquiesced or permitted other Apple employees to utilize

your Prior Invention in the course of their development or implementation of the

Apple Product, or (iii) upon first learning of Apple's use of your Prior Invention

you do not immediately notify in writing your Apple vice president of Apple's

infringing use of your Prior Invention and the need for a license thereto.

We can't advise people about the interpretation of this language, though -- the

agreement is what it is.  **If they have questions about it, they would need to**

**consult with their own counsel...".**

8

16. The IPA immediately prior to the signature line stated, **"7.0 Voluntary Agreement. You further acknowledge that you have had the opportunity to discuss this Agreement with your private legal counsel".**

17. Plaintiff does not have an attorney on retainer; therefore plaintiffs had to identify attorneys, forward the IPA to them, discuss plaintiff questions with them and obtain their advice.  Between July 20 to 26 2011 plaintiff sent emails and had conversations with several attorneys to obtain clarification on the IPA.   One attorney suggested that plaintiff consider a document to protect plaintiff, as Apple is a big Corporation with lots of legal resources.

18. On July 20, 2011 after the close of business plaintiff received an email from Ken Cooke, Apple Training and Development that welcomed new Apple store employees.   **EXHIBIT E.**

19. On July 21 plaintiff returned to Apple to pick up the documents and was given copies of a package of documents titled; new hire paperwork checklist.   Plaintiff again discussed the IPA and was told that all employees sign the IPA, before they start work.  Page two of the offer letter states "You must sign the Intellectual Property Agreement and return the signed agreement with this offer letter.   Any exceptions or approvals required under the terms of the Intellectual Property Agreement must be approved by your division's vice president and Apple's Legal Department prior to your beginning work".   Plaintiff explained that plaintiff would need to obtain advice from an attorney.  Mr. Kruoch told plaintiff that plaintiff would not be able to start on July 23, the date on the offer letter, and that the next time date plaintiff could start would be August 6, 2011.  Mr. Kruoch nor any other person offered or suggested that a request for an exception could be

requested from the division vice president so that plaintiff could begin training on July 23.

20. Plaintiff sent emails to several attorneys and explained that Apple's employment offer was contingent on plaintiff signing an IPA.   Following an exchange of emails, one of the attorney's pointed out the "if" in the IPA statement.   If, any one of the three events takes place, Apple would have rights to plaintiff work.  "If",

   a. you were involved in the development or implementation of that portion of the Apple Product which infringes your Prior Invention.

   b. you acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their development or implementation of the Apple Product.

   c. upon first learning of Apple's use of your Prior Invention you do not immediately notify in writing your Apple vice president of Apple's infringing use of your Prior Invention and the need for a license thereto.

21. It is a challenge for a person plaintiff age to get a job particularly in the current economic environment therefore, because the scope of the work of the Specialist position that Apple offered plaintiff does not involve plaintiff copyrighted work plaintiff decided to sign the IPA.

22. On August 1, 2011 plaintiff stopped at Apple to sign the IPA.  Sal informed plaintiff that no one was in HR and that he could not accept a sealed envelope with the IPA.

23. On August 1, 2011 a couple hours after leaving the Apple store Dana Brooks called plaintiff.   Plaintiff later learned Ms. Brooks is the Assistant HR Lead.   Ms. Brooks told plaintiff that all positions were filled.   Plaintiff scheduled an August 3,

2011 meeting with Ms. Brooks to discuss what happened to the offer Apple made, and that plaintiff accepted contingent on IPA agreement.

24. On August 3 prior to the meeting plaintiff chatted with Mr. Kruoch.  Plaintiff was surprised when neither Mr. Kruoch nor Mr. Martinez whom plaintiff had primarily interacted with were not in the meeting.  As the forgoing indicates, most if not all of plaintiff communication had been with Mr. Kruoch and or Mr. Martinez.  Mr. Kruoch could confirm that he told plaintiff that plaintiff could start on August 6. Patricia Bailey was in the room during the meeting, however did not participate. Also in the room was a man who sat at a computer with his back to plaintiff. Plaintiff had never seen him before.  When plaintiff asked who he was, Ms. Brooks stated that he is a senior manager.   He did not participate or make any comment during the meeting, nor was plaintiff introduced to him.  As plaintiff was leaving plaintiff introduced herself and the man told plaintiff his name is Mario.

25. Ms. Brooks stated "most" positions were filled, a difference from her statement on the August 1st phone call that "all" positions were filled.   Plaintiff stated "most" indicates positions are still open, and Ms. Brooks stated, there are qualified candidates in the pipeline and Apple has thousands of candidates.  Ms. Brooks stated that plaintiff did not accept the position and that plaintiff offer had expired. Plaintiff told Ms. Brooks that since plaintiff could not sign the IPA until plaintiff obtained legal advice, Mr. Kruoch told plaintiff that plaintiff would not be able to start on July 23 and that plaintiff start date would be August 6.  Dana stated that the August 6 date was a date plaintiff could start, not that it was offered as a start date.   Plaintiff wrote in plaintiff notes, what is the difference.

26. Ms. Brooks also stated that Mr. Wichmann email provided the clarification on the IPA.  Plaintiff went over to the computer Ms. Brooks was reading from and asked Ms. Brooks to scroll down to the section of Mr. Wichmann's email that states, "we can't advise people about the interpretation of this language, though -- the agreement is what it is.  If they have questions about it, they would need to consult with their own counsel."

27. Ms. Brooks made issue with plaintiff return on July 21 to pick up copies of docs, to sign the IPA, and that plaintiff asked for forms plaintiff had signed contingent on…Plaintiff clarified and asked Ms. Bailey to confirm plaintiff conversation with her that plaintiff did not have the forms plaintiff signed and would return to pick them up, and that plaintiff return was not to sign the IPA.

28. Plaintiff questioned, why the offer letter dated July 19, 2011 was only valid until Friday July 22, 2011 while Apple continued to actively recruit to fill positions.   Is it typical that all of Apple's offers are made and require acceptance within a three (3) day window?  Both Mr. Kruoch and Mr. Martinez were fully aware that the delay was because plaintiff had to obtain legal advice on Apple's IPA.  Plaintiff was not concerned because Mr. Kruoch informed plaintiff that since plaintiff could not sign the IPA plaintiff training start date would be August 6, 2011.

29. Plaintiff also questioned the reason plaintiff was "qualified" when the offer was made, and was not "qualified" for the open positions that Ms. Brooks stated Apple had qualified candidates in the pipe line to fill.

30. On August 10th plaintiff called Apple and left a message for Ms. Brooks.  Mr. Kruoch asked the reason for plaintiff call.   Plaintiff told Mr. Kruoch that plaintiff had just reviewed the package of new hire docs plaintiff was given and a

document was missing that plaintiff had signed, contingent on… Mr. Krouch

immediately acknowledged and stated it was the offer letter and that he would

get it from Mr. Martinez and send it to plaintiff.

31. On August 11th Mr. Kruoch called and told plaintiff that Ms. Brooks wanted

plaintiff to send her an email requesting the offer letter plaintiff signed contingent

on.   Plaintiff asked Mr. Kruoch to send plaintiff an email making the request.

When plaintiff did on receive the email plaintiff sent an email to Ms. Brooks.

Several days later on August 15, 2011 plaintiff received an email, from Ms.

Brooks.   The email stated, "We discard all documents and do not retain

paperwork onsite.   When your offer expired on July 22, your documents were

properly discarded.  It is also my understanding that you previously requested all

signed copies of all your documents on July 19 and you picked these documents

up on July 20".

32. Because of Federal record retention laws, plaintiff thought Ms. Brooks meant that

documents were not kept "onsite" so plaintiff responded.   Plaintiff summarized

from the August 3rd meeting discussion and plaintiff August 10th call with Mr.

Kruoch.   Ms. Brooks replied that when plaintiff offer expired, Apple discarded all

documents with plaintiff signature and that the documents no longer exist.

**EXHIBIT F** are the emails exchanged.

33. Plaintiff questioned when did Apple know that the document was "no longer

available", "discarded". On plaintiff August 10, 2011 call Mr. Kruoch

acknowledged it was the offer letter that was missing, and stated he would get it

from Mr. Martinez and send it to plaintiff.   On August 11, 2011 Mr. Kruoch called

and stated that Ms. Brooks wanted plaintiff to send an email requesting the letter.

34. Did Apple make a job offer, or was it pretext to suggest that Apple does hire older individuals?   Plaintiff discussed plaintiff believe that Apple does not hire mature individuals with Toni and Apple Human Resource recruitment staff.   Plaintiff also discussed plaintiff letter to Steve Job that stated Apple's workforce represents the younger demographic that Apple markets to.

   - Was it reasonable to expect that within three (3) days plaintiff could identify attorneys, provide the IPA to attorneys, obtain their advice and sign a five (5) page IPA agreement?

   - Was it reasonable for plaintiff to believe as informed by Mr. Kruoch, that plaintiff would be able to start on August 6, 2011?

   - Was it reasonable as Apple continued to recruit to fill open positions to expect that Apple would have called plaintiff to obtain the status, and or advise plaintiff that the offer would expire, or suggest that an exception would be requested?

35. Plaintiff was informed that Maggie Gregg is the HR Lead for the Region.   Plaintiff was unable to leave a message on Ms. Gregg's voice mail and did not receive a response to the email plaintiff sent therefore plaintiff went to Apple's Regional office on West 14th Street.   While plaintiff waited to see Ms. Gregg plaintiff could hear two women making calls to applicants and asking their interest in employment with Apple.   Plaintiff briefly told Ms. Gregg that plaintiff had not been able to reach her by phone and had not received a response to plaintiff email.   Ms. Gregg stated that her schedule was busy and that she would prefer a phone discussion rather than an in person meeting.

36. On the August 30, 2011 scheduled call Ms. Gregg informed plaintiff that she was aware of the events that occurred, and stated that plaintiff did not complete the paperwork and that plaintiff offer expired.   Ms. Gregg further stated that plaintiff was not an Apple employee, that the store had discretion to make a decision and that Apple did not have to maintain the documents, plaintiff paperwork was destroyed.

37. Plaintiff called Apple corporate office and spoke to the Assistant of the VP of Human Resources.   She informed plaintiff that someone would be in contact with plaintiff.

38. Tony Lagares a Senior Manager of Apple Retail Human Resources contacted plaintiff.   Plaintiff asserted that plaintiff signed the offer letter contingent on the IPA Agreement.   Plaintiff requested a position at another Apple store.   Because of the lower cost of living and that plaintiff had been unemployed for months, plaintiff requested to be considered for positions in the Metro Atlanta area.

39. For two (2) months from September 2, 2011 to November 11, 2011 plaintiff had voice, text and, email communications with Mr. Lagares without resolution.   Mr. Lagares often stated he was traveling; going in a meeting…   plaintiff did not get the sense that resolution of plaintiff HR issue was a priority.   Apple did not offer plaintiff a position.

40. Plaintiff continued to update plaintiff profile on Apple's Job Opportunities website and applied for Specialist, Business Specialist and Business Leader positions at all retail stores within a reasonable commuting distance of New York City, and the Metro Atlanta area.   Apple website consistently lists current openings at multiple locations.   In addition, Apple staffed and opened two (2) new stores.

**EXHIBIT G** is the Wall Street Journal article on the December 2011 Grand Central store opening that stated that the store, one of Apple's largest at 23,000 square feet would employ 315 people.   In June 2012 Apple staffed and opened the Yonkers store that employs approximately 200 people.

41. Based on the foregoing plaintiff asserts that Apple filled a significant number of positions with individuals significantly younger than plaintiff to infer Age Discrimination, and did not again interview or offer plaintiff a Specialist position.

42. Apple discriminated against plaintiff due to plaintiff age.   Aside the expired offer, there were multiple opportunities for Apple to hire plaintiff.

## **IRREPARABLE HARM**

"The Supreme Court has said: "It seems clear that the temporary loss of income, ultimately to be recovered does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 [39 L. Ed. 2d 166, 94 S. Ct. 937] . . . (1974)

In Callicotte v. Carlucci, 698 F.Supp. 944 the court in citing Sampson v. Murray stated;

"The government, relying on *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed. 2d 166 (1974), urges the Court to adopt a higher standard for interim injunctive relief in federal personnel actions. The Supreme Court in *Sampson* required the plaintiff, a federal employee who alleged that the agency dismissed her without following the procedures under the Civil Service Act, to show irreparable injury of an "extraordinary degree" for injunctive relief, *id.* 415 U.S. at 92 n. 68, 94 S.Ct. at 953 n. 68. The Court predicated its imposition of a higher standard on the grounds that the government must be given wide latitude to handle its own internal personnel affairs. *Id.* at 83, 94 S.Ct. at 949. The Court, however, did not and has not expressly extended this rule to employees alleging violations of their statutory civil rights. Such challenges raise equally

16

compelling, if not stronger governmental interests, in the enforcement of our nation's

**cases would undermine this vital interest in eradicating discrimination".**

**It would also undermine the Congressional Intent in the passing of the ADEA.**

When evaluating motions for injunctive relief in discrimination actions, several circuit

courts have refused to adopt a higher standard and relied instead on the traditional one.

See Holt v. Continental Group Inc., 708 F.2d 87, 91 (2d Cir.1983); E.E.O.C. v. Anchor

Hocking Corp., 666 F.2d 1037 (6th Cir.1981); Porter v. Adams, 639 F.2d 273 (5th

Cir.1981). This Circuit has not resolved whether or not a higher standard is required for

plaintiffs challenging their dismissal on grounds of discrimination. See Wagner v. Taylor,

836 F.2d 566, 575 n. 66 (D.C.Cir.1987). While the Court is not persuaded that the

higher standard should apply in actions brought under the civil rights laws, it need not

resolve the issue for purposes of this litigation because the plaintiff has satisfied her

burden under either standard.

In, Akili v. Sise, 38 FEP 553 (N.D.N.Y. 1984,in a **Title VII** *case*. The plaintiff sought a

preliminary injunction to prevent his being discharged from his job as a typist, allegedly

because of race discrimination. The court held that the **pending loss of his earnings**

**and the possibility that he might be unable to secure another job** were clearly

insufficient to show "irreparable harm."

In Holt v. Continental, 708 F.2d 87 a **Title VII** case, the court stated, "With respect to

irreparable injury, an absolute requirement for a preliminary injunction, Triebwasser &

Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1359 (2d Cir.1976), we

agree with Judge Zampano that the requisite irreparable harm is not established in

employee discharge cases by financial distress or **inability to find other employment,**

**unless truly extraordinary circumstances are shown**. Sampson v. Murray, 415 U.S.

61, 91-92 & n. 68, 94 S.Ct. 937, 953 & n. 68, 39 L.Ed.2d 166 (1974); EEOC v. City of Janesville, 630 F.2d 1254, 1259 (7th Cir.1980)".

Most ADEA cases are extraordinary.   It is stated and was acknowledged in the ADEA Congressional Statement of Findings and Purpose.   It is demonstrated in the challenges that individuals protected under the Act experience in finding employment in the current economic environment.   Today, the country is beginning to show signs of recovery from a recession and jobs and employment are the top issues cited by citizens in the current presidential campaign.   Due to high unemployment and the economic environment older workers have experienced the greatest impact as they are who are first laid off, and who must compete with younger workers who because of high unemployment apply and will accept even part time positions well below their skills, experience and qualifications.

The loss is not "temporary" as cited by the Supreme Court in Sampson.   Mature applicants never regain the lost compensation and in many, many cases prematurely began Social Security annuity to obtain a source of income.   Moreover it is a different economic environment than when the Supreme Court in Sampson ruled in 1974.   The high unemployment of the past 4 years is almost double what it was in 1974 therein loss of income, as in the case of plaintiff, has not been "temporary".

Citing from Monroe v. United Air Lines Inc. 736 F. 2d 394.   The ADEA was enacted in 1967 in response to growing concern over unemployment among older workers and Congress' belief that much of the problem was attributable to "arbitrary discrimination in employment because of age. "29 U.S.C. Sec. 621 (Congressional Statement of Findings and Purpose).   One step Congress took in dealing with age discrimination was

to make it unlawful for an employer "to fail or refuse to hire or to discharge any individual … because of such individual's age. "29 U.S.C. Sec. 623 (a)(1).

29 USC § 621 - CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE

**(a)** The Congress hereby finds and declares that—

**(1)** in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;

**(2)** the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;

**(3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;**

**(4)** the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.

**(b)** It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

Further in support is the court's statement in Callicotte v. Carlucci.  Extending the higher standard to employment discrimination cases will undermine the vital interest in

eradicating discrimination and, will also undermine the Congressional Intent/Purpose in passing the ADEA.

Additional evidence is a recently published article in the <u>Wall Street Journal</u>, "Oldest Baby Boomers Face Jobs Bust," cited U.S. Department of Labor ("DOL") statistics that four million Americans aged 55 to 64 are unable to find work, a number that has doubled over the course of five years.  The article also cited DOL statistics showing that the average duration of unemployment for those aged 55 to 64 is 56.6 weeks, as compared to 35.9 weeks for 25- to 34-year-olds, and 47.8 weeks for 45- to 54-year-olds. For the reasons cited and discussed plaintiff further asserts that the standard for Preliminary injunction in ADEA cases should not be the same as in than other employment discrimination cases

In age discrimination cases, courts have awarded preliminary relief when the employee's entire future economic stability would be jeopardized by the employer's action. Thus, in Morrow v. Inmont Corp., 30 F.E.P.Cas. (BNA) 1019 (W.D.N.C. 1982), the court issued a preliminary injunction reinstating a saleswoman who was fired after filing charges of sex and age discrimination. The court justified its action on the basis that she would suffer irreparable loss of commissions and business contacts while waiting for her charges to be litigated. **The plaintiff had been unable to find other work. The court observed that she "is being punished daily for pursuing her rights, and there is substantial likelihood that she cannot be made whole** . . . if she is not provided interim relief." 30 F.E.P.Cas. (BNA) at 1026. See Monroe v. United Airlines, Inc., 34 F.E.P.Cas. (BNA) 1610 (N.D.Ill. 1983).

According to information prepared by Nancy Pelosi, former Speaker of the U.S. House of Representatives, job losses in the current recession have been much more severe

than previous recessions.  Till vonWachter, an economics professor at Columbia University in a study on the long-term earnings of workers who lost their jobs[1] stated, "On average most workers do not recover their old annual earnings."  The study further stated, **"Older workers' wages usually slide more than those of younger workers"**. Ann Huff Stevens, an economics professor at the University of California, Davis In the book, Never Say Die: The Myth and Marketing of the New Old Age[2] stated; "You're at the bottom of the totem pole again."   The book also quotes, Till von Wachter, ""most workers will not find new jobs that pay as much as their old jobs **– lifetime earnings will inevitable be lower as a result of a midlife employment interruption".**

Unlike Sampson plaintiff exhausted administrative remedies and filed an action in the Federal Court.  Plaintiff in the instant case is homeless because plaintiff has not been able to find employment.   Plaintiff income is fixed as plaintiff also prematurely began Social Security annuity.  Plaintiff projected earnings with Apple of approximately $2000.00 per month would have allowed plaintiff to obtain housing.   Plaintiff has not recovered from lost income and is homeless.   Plaintiff stayed in a hotel in Secaucus, New Jersey where plaintiff had obtained a favorable monthly rate that is affordable given plaintiff's fixed income.  However on October 3, 2012 plaintiff was illegally locked out of plaintiff room.   The attached Warrant of Removal, **EXHIBIT H** shows that the Hudson County Court Special Civil Part granted the Warrant to remove plaintiff from the Hotel plaintiff stayed.  Plaintiff Affidavit further attests to the hardship and emotional distress the actions caused plaintiff.

---

[1] Income Loss Persists Long After Layoffs
[2] Never Say Die:  The Myth and Marketing of the New Old Age by Susan Jacoby

In the instant case the claim is not simply that an employee has been discharged and thereby has suffered injuries normally compensable by money.  Rather plaintiff has experienced emotional distress, loss of income that would have enabled plaintiff to obtain housing.   Plaintiff cannot recover; no monetary reward can compensate for the loss of housing, for the emotional pain and suffering, from the loss of constitutional rights, for other fundamental rights such as being counted in the census.   When plaintiff applied for employment with Apple one of plaintiff's objective was a source of income to find housing.  Plaintiff informed Apple's recruitment manager Tony Lagares that due to the high cost of housing in the New York area plaintiff would like to be considered for Specialist positions in Atlanta.   Because of the lower cost of housing, the income plaintiff would have earned would more than comfortably have allowed plaintiff to find housing in that area.

Reuters Ltd. v. United Press Int'l, 903 F.2d 904 (2d Cir. 1990). "[A] plaintiff **must demonstrate an actual and imminent threat of irreparable injury if the injunction were not granted**. The harm must not be remote or speculative, and the injury alleged must be one incapable of being fully remedies by money damages."  903 F.2d at 907.   Plaintiff has experienced/demonstrated actualized irreparable injury.   The granting of plaintiff request for injunctive relief will enable plaintiff to afford and obtain housing.

A tongue-in-cheek review in the Wall Street Journal, entitled "Revenge of the 60-Year-Old Has Beens," recently suggested that, "Once you're past 60, you should be thinking about making a graceful, dignified move towards the exit."  No wonder those who have attained the sixth decade of life may face the competitive job market not only with fear and trembling, but also with exquisite sensitivity for their legal rights.

Consequently, employers' time will also be well-spent considering in detail the ADEA and other laws that deal with duties to older workers."

In a Title VII case where the plaintiff's faced eviction, there are similar elements to the instant case, Carlos Aguilar; Eugenia Balcarcel; Dalton Castellano; Ralph Degracia; Apolonio Palencia; Blanca Rivera; And Enrique Valderama, Plaintiffs, v. Baine Service Systems, Inc., 538 F. Supp. 581, the court cited the standard for preliminary injunction in the 2nd Circuit, Jackson Dairy, granted preliminary relief for the plaintiff and stated; "If a preliminary injunction is not issued, plaintiffs will lose their jobs and sole means of financial support.  See affidavits attached to Plaintiffs' Motion for Preliminary Injunction. The opportunity for unemployment insurance only exists if the defendants do not renew their allegedly empty promises of reemployment.  The general rule is that an injunction should not issue when the remedy at law is adequate, Jackson Dairy, supra, 596 F.2d at 72. However, the harm generated by loss of employment extends beyond financial boundaries.  The plaintiffs face eviction, cut-off of their utilities and the inability to provide for their children.  "[In] many cases the effect on the complainant of several months without work... will constitute harm that cannot be adequately remedied by a later award of damages." Sheehan, supra, slip. op. at 5540.  The plaintiffs' circumstances present ample support for a finding of irreparable harm."

Plaintiff circumstances in this case present overwhelming evidence in support of a finding of irreparable harm.

Finally, the Fifteenth Amendment ratified February 3, 1870 provided that, "The right of U.S. Citizens to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of **servitude**".  Plaintiff Fifteenth Amendment rights have been abridged simply because plaintiff cannot obtain

employment so that plaintiff may afford housing and therein have an address so that plaintiff may register to vote, be counted.   That is irreparable!

## SUCCESS ON THE MERITS

The instant case is not a mixed motive case.  Plaintiff established a Prima Facie case.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual (over 40 years of age) or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. §§ 623 (a)(1), 631(a).

To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under "circumstances giving rise to an inference of discrimination." *See Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001).  See Terry v. Ashcroft, 336 F.3d 128 (2003).

Under either statute, once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) (ADEA). Thus, once the defendant has made a showing of a neutral reason for the complained of action, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern, 131 F.3d at 312.*

It is undisputed that plaintiff is over the age of 60 and protected by the ADEA.   It is also undisputed that plaintiff applied for positions with Apple and that Apple acknowledged plaintiff qualifications when Apple made a written offer to plaintiff for a Specialist position.  ¶ 12, Ex B.

It is also undisputed that plaintiff questioned and requested clarification on a statement in Apple's Intellectual Property Agreement, Ex C**,** that stated, "If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, worldwide license to any Prior Invention that is now or hereafter infringed by an Apple product, process, or method of doing business (hereinafter "Apple Product".  In response Apple forwarded to plaintiff an email from Trey Wichmann of Apple Compliance. ¶ 15 Ex D.

Plaintiff informed Mr. Kruoch and Mr. Martinez that plaintiff would need to obtain advice from an attorney.  Mr. Kruoch informed plaintiff that plaintiff would not be able to start on July 23, the date on the offer letter, and that the next time/date plaintiff could start would be August 6, 2011. ¶ **19.**

When plaintiff returned on August 1, 2011 to sign the IPA Ms. Brooks stated that all positions were filled.   On August 3, 2011 Ms. Brooks then stated that "most" positions were filled and that there were qualified applicants in the pipeline.

Plaintiff asserts that plaintiff was as qualified on August 3, as plaintiff was on July 19 when Apple made a written offer to plaintiff therefore questioned why plaintiff was not at the top of the pipeline of qualified candidates?

Apple stated that it was their discretion whether to offer plaintiff a position as plaintiff offer letter had expired.   Plaintiff further questioned, the reason the offer letter dated July 19, 2011 was only valid until Friday July 22, 2011 while Apple

**continued to actively recruit and call applicants to find out their interest in positions**.

Plaintiff signed the offer letter contingent on the IPA agreement and, a day later Apple sent plaintiff a welcome employee letter, ¶ 18, Ex. E.  Henceforth plaintiff believed that plaintiff was an Apple employee.

Apple stated that the offer letter plaintiff signed contingent on the IPA agreement was destroyed. ¶¶ 30 to 34.   Therein Apple violated Federal Record retention laws and destroyed evidence that would substantiate plaintiff claims.

Pursuant to U.S. Code 29 CFR § 1627.3(b)(1), Employer record retention requirements for ADEA are established by Federal law and states, "Every employer who in the regular course of his business, makes, obtain, or uses, any personnel or employment records related to the following shall except as provided in paragraph (b)(3) and (4) of this section, keep them for a period of 1 years from the date of the personnel action to which any records relate".

    (i)  "Job applications, resumes or any other form of employment inquiry whenever submitted to the employer in response to his advertisement or other notice of existing or anticipated job openings, including records pertaining to the failure or refusal to hire any individual".

    (ii)  "Any advertisement or notices to the public or to employees relating to job openings, promotions, training programs, or opportunities for overtime work".

(3) "When an enforcement action is commenced under section 7 of the Act regarding a particular applicant or employee, the Commission or its authorized representative shall require the employer to retain any record required to be kept

under paragraph (b) (1) or (2) of this section which is relative to such action until the final disposition thereof".

Apple stated that the offer letter had expired and was destroyed, and is the reason Apple did not hire plaintiff.  What is Apple's response to the plaintiff questions in ¶ 34.   And, as discussed in ¶ 40 and Ex. G since plaintiff continued to be qualified what is the reason plaintiff was not hired when Apple staffed and opened the Grand Central store in December 2011 with 315 employees, and the Yonkers store in June 2012 with approximately 200 employees.

Additionally, Apple job opportunities website consistently showed current openings for Specialist positions at just about all New York retail stores and, all Metro Atlanta stores.

Jobs for all individuals in the current economic environment are difficult to find and multiple times more difficult for individuals protected under the ADEA.  Plaintiff alleges the reason Apple offered plaintiff a position was plaintiff discussions and statements that Apple's marketing focus is younger individuals, college students, and that Apple's workforce represents the demographic Apple wants to attract. The picture shown on Apple's Job Opportunities website, **EXHIBIT I** communicates/publishes Apple's hiring preference.

 "The McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination", as plaintiff has in the instant case. TransWorld v. Thurston, 469 U.S. 111 (1985).

| McDonnell Douglas Prima Facie Standard | Peterson V. Apple |
|---|---|
|  |  |
| Membership in a protected group | Achieved.  Plaintiff is over the age of 60 and protected by the ADEA, |
| Applied and was qualified for the jobs in question | Achieved.  Applied and Qualified established by Apple offer to plaintiff |
| Was subject to adverse action | Achieved. Plaintiff returned to sign the IPA. However, Apple stated no openings, then told "most" positions were filled and qualified candidates were in the pipeline while Apple continued to actively recruit |
| The circumstances give rise to an inference of discrimination | Achieved.  Apple staffed and opened two stores.  Grand Central 315 positions, Yonkers approximately 200 positions, and filled a significant number of Specialist positions in the Metro NYC area and, the Metro Atlanta area |

## BALANCING OF HARDSHIPS TIPPING DECIDEDLY TOWARD THE PARTY REQUESTING THE PRELIMINARY RELIEF

The Jackson Dairy analysis requires that after this court determines that both irreparable harm and sufficiently serious questions addressing the merits are present, a balance of hardships tipping towards the plaintiffs must be found before an injunction will issue.

Apple Inc., is a California Corporation established in 1977.  Apple Inc. and its wholly-owned subsidiaries designs, manufactures and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content an applications.   The Company sells its products worldwide through its retail stores, online stores, and direct sales force, as well as through third-party cellular network carriers, wholesalers, retailers, and value-added resellers.

Apple reported quarterly revenue of $35.0 billion and a quarterly net profit of $8.8 billion for the Third Quarter, July 2012.   The company has approximately 327 retail stores and about 30,000 of 43,000 Apple employees in the United States work in Apple stores.

Apple will suffer no relative expense if an injunction is granted.   By contrast, withholding injunctive relief to plaintiff would continue the hardship the denial of employment caused, and plaintiff will not be able to afford housing.  On balance, the equities favor the grant of injunctive relief to plaintiff.

For the all of the foregoing cited reasons plaintiff pray the court order injunctive relief for plaintiff as follows:

A.  Order that Apple immediately hire plaintiff in a Specialist or Business Leader position in the Atlanta area or location of plaintiff choice that has reasonable cost of living/housing

B.  Order Apple pay plaintiff half of the make whole remedies plaintiff is entitled; back pay, front pay and liquidated damages, and that plaintiff is immediately entitled to benefits

C.  Award attorney's fees and costs so that plaintiff may obtain legal consultation

D.  Award any other relief the Court determines appropriate and necessary


Respectfully submitted,

/s/ Andrea Peterson

_____                    Dated:  October 14, 2012
Andrea Peterson
P.O. Box 582
New York, NY 10108
917-504.6858
ajnpeterson@gmail.com

29